Index of Exhibits

| Exhibit | Document |
| --- | --- |
| A | Copy of state court action in Maricopa County Superior Court Case No. CV2018-007464 |
| A-1 | Certification of Complex Case |
| A-2 | Motion to Designate the Case as Complex |
| A-3 | Certificate of Compulsory Arbitration |
| A-4 | Civil Cover Sheet |
| A-5 | Complaint |
| A-6 | First Amended Complaint |
| A-7 | Case Status Minute Entry |
| A-8 | Ex Parte Motion for Extension of Time to Serve Defendants |
| A-9 | Order to Extend Time for Service |
| A-10 | Minute Entry Notice of Intent to Dismiss for Lack of Service |
| A-11 | Ex Parte Motion for: (1) Leave to Amend the Complaint to Substitute Real Party in Interest, (2) an Extension of Time to Accomplish Service of Process on Defendants, and (3) an Order Permitting Service by Alternate Means (with exhibits, including Second Amended Complaint) |
| A-12 | Order to file Second Amended Complaint and extend time for service |
| B | Arizona Corporation Commission's website entity detail for Epicenter Loss Recovery LLC |
| C | Articles of Organization of Epicenter Loss Recovery LLC |

141609044.1

# Exhibit A

# Exhibit A-1

MICHAEL K. JEANES, CLERK
BY
*J. fierro*
SEP
FILED

**18 MAY 11  PM 4: 56**

1  Michael C. Manning (#016255)
   Jeffrey Goulder (#010258)
2  Stefan Palys (#024752)
   James Camoriano (#034181)
3  **STINSON LEONARD STREET LLP**
   1850 N. Central Avenue, Suite 2100
4  Phoenix, Arizona  85004-4584
   Tel: (602) 279-1600
5  Fax: (602) 240-6925
   michael.manning@stinson.com
6  jeffrey.goulder@stinson.com
   stefan.palys@stinson.com
7  james.camoriano@stinson.com

8  *Attorneys for Plaintiffs*

9                **SUPERIOR COURT OF ARIZONA**

10                    **MARICOPA COUNTY**

11  EPICENTER PARTNERS LLC and          No.    CV 2018-007464
    GRAY MEYER FANNIN LLC, by and
12  through ROI PROPERTIES, LLC,        **CERTIFICATION OF COMPLEX CASE**
    LIQUIDATING TRUSTEE OF THE
13  MAY LIQUIDATING TRUST,              (Commercial Court Eligible)

14                    Plaintiffs,       (Complex Civil Action Eligible)

15  v.                                  [X] Certification of Complexity

16                                      [  ] Joint Certification of Complexity
    BURFORD CAPITAL LTD., and
17  GANYMEDE INVESTMENTS LTD.           [  ] Contravening Certification No.

18                    Defendants.

19

20

21          The undersigned certifies that this action is a complex case for the following reasons:

22      **X**  Numerous pretrial motions raising difficult or novel legal issues that will be time-

23          consuming to resolve;

24      **X**  Management of a large number of witnesses or a substantial amount of

25          documentary evidence;

26      []  Management of a large number of separately represented parties;

27

28

[] Coordination with the following related actions pending in one or more courts in other counties, states or countries, or in a federal court;

[] Substantial post-judgment judicial supervision;

X The case would benefit from permanent assignment to a judge who would have acquired a substantial body of knowledge in a specific area of the law;

X Inherently complex legal issues;

X Factors justifying the expeditious resolution of an otherwise complex dispute;

X The following other factor(s) warranting designation as a complex case, in the interest of justice:

Corporate defendants organized outside the laws of the United States

_____

_____

_____

[]The (undersigned certifies) (parties certify) that this action is not a complex case for the following reasons:

_____

_____

_____

_____

2

CORE/3506557.0002/139592100.1

RESPECTFULLY SUBMITTED this 11th day of May, 2018.

                                        **STINSON LEONARD STREET LLP**

                                        By: _____
                                             Michael C. Manning
                                             Jeffrey J. Goulder
                                             Stefan M. Palys
                                             James Camoriano
                                             1850 N Central Ave., Ste. 2100
                                             Phoenix, AZ 85004
                                             Attorneys for Plaintiffs

ORIGINAL filed this 11th day of May, 2018:

Clerk of the Court
Maricopa County Superior Court
101/201 West Jefferson
Phoenix, Arizona  85003

_____

3

# Exhibit A-2

MICHAEL K. JEANES, CLERK
BY   J. fierro   DEP
FILED

18 MAY 11  PM 4: 56

1 | Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
2 | Stefan Palys (#024752)
James Camoriano (#034181)
3 | **STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
4 | Phoenix, Arizona  85004-4584
Tel:  (602) 279-1600
5 | Fax: (602) 240-6925
michael.manning@stinson.com
6 | jeffrey.goulder@stinson.com
stefan.palys@stinson.com
7 | james.camoriano@stinson.com

8 | *Attorneys for Plaintiffs*

9 | **SUPERIOR COURT OF ARIZONA**

10 | **MARICOPA COUNTY**

11 | EPICENTER PARTNERS LLC and
GRAY MEYER FANNIN LLC, by and
12 | through ROI PROPERTIES, LLC,
LIQUIDATING TRUSTEE OF THE
13 | MAY LIQUIDATING TRUST,

14 | Plaintiffs,

15 | v.

16 | BURFORD CAPITAL LTD., and
GANYMEDE INVESTMENTS LTD.
17 |

18 | Defendants.

No.   CV 2018-007464

**MOTION TO DESIGNATE THE CASE
AS COMPLEX**

(Commercial Court Eligible)

19 |

20 | Plaintiffs move to designate this case as a Complex Civil Action pursuant to Ariz R.

21 | Civ. P. 8(h). As background, Defendant Burford Capital Ltd. (a foreign corporation organized

22 | under the laws of Guernsey) formed Defendant Ganymede Investments, Ltd. to provide

23 | litigation funding to Plaintiffs (Arizona limited liability companies). Through several contracts

24 | of adhesion and threats to declare Plaintiffs in default, Burford converted its net investment of

25 | $1.35 million into a note worth approximately $50 million, secured by virtually all of

26 | Plaintiffs' assets. Rather than allow Plaintiffs to pay the note on time, Burford and Ganymede

27 | violated their duties of good faith and fair dealing by scuttling Plaintiffs' efforts to do so.

28 | Burford widely advertised the note for sale at a substantial discount through a blast email to

CORE/3506557.0002/139577250.2

1   hundreds or thousands of participants in the Phoenix and Southwest real estate markets,

2   signaling to these market participants both that Plaintiffs were in financial distress, and that

3   Plaintiffs' assets could likely be bought for less than market value upon default.  The result of

4   these marketing efforts/breaches of the duty of good faith and fair dealing was that buyers and

5   prospective lenders would no longer negotiate with Plaintiffs, and Plaintiffs were therefore

6   unable to sell all or part of their property to refinance or satisfy the "debt" to Ganymede.  This

7   has caused more than $150 million in damages to Plaintiffs.

8          Rule 8(h)(2) provides that, in deciding whether a civil action is a complex case under

9   subdivision (h)(1), the Court must consider the following factors:

10          (A) numerous pretrial motions raising difficult or novel legal issues that will be

11          time-consuming to resolve;

12          (B) management of a large number of witnesses or a substantial amount of

13          documentary evidence;

14          (C) management of a large number of separately represented parties;

15          (D) coordination with related actions pending in one or more courts in other

16          counties, states or countries, or in a federal court;

17          (E) substantial postjudgment judicial supervision;

18          (F) the case would benefit from permanent assignment to a judge who would

19          have acquired a substantial body of knowledge in a specific area of the law;

20          (G) inherently complex legal issues;

21          (H) factors justifying the expeditious resolution of an otherwise complex dispute;

22          and

23          (I) any other factor which in the interests of justice warrants a complex

24          designation or as otherwise required to serve the interests of justice.

25          These factors weigh in favor of a Complex Civil Action designation. Plaintiffs

26   anticipate that this case will involve numerous pre-trial motions concerning legal issues and

27   issues related to discovery and disclosure. Because of the nature of the claims asserted in this

28                                                    2

1   action and the $150 million in damages at issue, it is anticipated that the case will be zealously
2   litigated by all of the parties.

3       Second, this litigation concerns events and conduct transpiring over the course of
4   several years, which involved large numbers of third party witnesses.  Plaintiffs therefore
5   anticipate a high volume of documentary evidence.

6       Finally, because of the nature of this case and the complexity of some of the issues,
7   including the fact that the defendants are organized outside of the United States, this case
8   would benefit from permanent assignment to the same judge who would become familiar with
9   the parties and the key facts of the case so the parties can adjudicate this action as efficiently as
10  possible.

11      For the foregoing reasons, Plaintiffs respectfully request that the Court designate this
12  case as a Complex Civil Action.

13  RESPECTFULLY SUBMITTED this 11th day of May, 2018.

14
15                                          **STINSON LEONARD STREET LLP**
16                              By: _____
17                                          Michael C. Manning
                                            Jeffrey J. Goulder
18                                          Stefan M. Palys
                                            James Camoriano
19                                          1850 N Central Ave., Ste. 2100
                                            Phoenix, AZ 85004
20                                          Attorneys for Plaintiffs

21  ORIGINAL filed this 11th day of May,
    2018:
22
    Clerk of the Court
23  Maricopa County Superior Court
    101/201 West Jefferson
24  Phoenix, Arizona  85003

25
26  _____
27
28                                          3

CORE/3506557.0002/139577250.2

# Exhibit A-3

1  Michael C. Manning (#016255)
   Jeffrey Goulder (#010258)
2  Stefan Palys (#024752)
   James Camoriano (#034181)
3  **STINSON LEONARD STREET LLP**
   1850 N. Central Avenue, Suite 2100
4  Phoenix, Arizona  85004-4584
5  Tel:  (602) 279-1600
   Fax:  (602) 240-6925
6  michael.manning@stinson.com
7  jeffrey.goulder@stinson.com
   stefan.palys@stinson.com
8  james.camoriano@stinson.com
9  *Attorneys for Plaintiffs*

10              **SUPERIOR COURT OF ARIZONA**

11                  **MARICOPA COUNTY**

12  EPICENTER PARTNERS LLC and
13  GRAY MEYER FANNIN LLC, by and          No. CV 2 0 1 8 - 0 0 7 4 6 4
    through ROI PROPERTIES, LLC,
14  LIQUIDATING TRUSTEE OF THE            **CERTIFICATE OF**
    MAY LIQUIDATING TRUST,               **COMPULSORY ARBITRATION**
15
16              Plaintiffs,               (Commercial Court Eligible)

17       vs.

18  BURFORD CAPITAL LTD., and
19  GANYMEDE INVESTMENTS LTD.,

20              Defendants..

21

22       Plaintiffs state that they know the limitations set forth by the Local Rules of

23  Practice for the Maricopa County Superior Court, and certify that this case **is not**

24  subject to compulsory arbitration, as provided by Rules 72 through 76 of the Arizona

25  Rules of Civil Procedure, because the largest award sought by Plaintiffs exceeds the

26  limits set by the Local Rules and Plaintiffs seek non-monetary relief in this action.

27

28

CORE/3506557.0002/139509748.1

RESPECTFULLY SUBMITTED this 11 day of May, 2018.

STINSON LEONARD STREET LLP

Michael C. Manning
Jeffrey Goulder
Stefan Palys
James Camoriano
1850 N Central Ave., Ste. 2100
Phoenix, AZ 85004
Attorneys for Plaintiffs

2

# Exhibit A-4

# In the Superior Court of the State of Arizona

## CV2018-007464

| | |
|---|---|
| **Is Interpreter Needed?** ☐ Yes ☒ No | MICHAEL K. JEANES, CLERK<br>BY Noticerra DEP<br>**FILED**<br>18 MAY 11 PM 4: |
| If yes, what language: | |

## CIVIL COVER SHEET- NEW FILING ONLY
(Please Type or Print)

Michael C. Manning, Jeffrey Goulder,

Plaintiff's Attorney  Stefan Palys, James Camoriano

Attorney Bar Number 016255, 010258, 024752, 034181

| Plaintiff's Name(s):  (List all) | Plaintiff's Address: | Phone #: | Email Address: |
|---|---|---|---|
| Epicenter Partners LLC | c/o Stinson Leonard Street LLP | 602.279.1600 | michael.manning@stinson.com |
| | 1850 N. Central Ave., #2100 | | jeffrey.goulder@stinson.com |
| | Phoenix, AZ 85004 | | stefan.palys@stinson.com |
| | | | james.camoriano@stinson.com |

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s):  (List All)    Burford Capital Ltd. and Ganymede Investments Ltd.

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT:    ☐ Temporary Restraining Order    ☐ Provisional Remedy    ☐ OSC

☐ Election Challenge    ☐ Employer Sanction    ☐ Other _____
(Specify)

☒ RULE 8(h) COMPLEX LITIGATION APPLIES. Rule 8(h) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.

(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category.)

☒ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER EXPERIMENTAL RULE 8.1. (Maricopa County only.) Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria.** See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category.** The words "commercial court assignment requested" must appear in the caption of the original complaint.

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

### 100 TORT MOTOR VEHICLE:

☐101 Non-Death/Personal Injury
☐102 Property Damage
☐103 Wrongful Death

### 110 TORT NON-MOTOR VEHICLE:

☐111 Negligence
☐112 Product Liability – Asbestos
☐112 Product Liability – Tobacco
☐112 Product Liability – Toxic/Other
☐113 Intentional Tort

☐114 Property Damage
☐115 Legal Malpractice
☐115 Malpractice – Other professional
☐117 Premises Liability
☐118 Slander/Libel/Defamation
☐116 Other (Specify) _____

### 120 MEDICAL MALPRACTICE:

☐121 Physician M.D.    ☐123 Hospital
☐122 Physician D.O    ☐124 Other

Case No._____

## 130 CONTRACTS:

- ☐ 131 Account (Open or Stated)
- ☐ 132 Promissory Note
- ☐ 133 Foreclosure
- ☐ 138 Buyer-Plaintiff
- ☐ 139 Fraud
- ☒ 134 Other Contract (i.e. Breach of Contract)
- ☐ 135 Excess Proceeds-Sale
- ☐ Construction Defects (Residential/Commercial)
  - ☐ 136 Six to Nineteen Structures
  - ☐ 137 Twenty or More Structures

## 150-199 OTHER CIVIL CASE TYPES:

- ☐ 156 Eminent Domain/Condemnation
- ☐ 151 Eviction Actions (Forcible and Special Detainers)
- ☐ 152 Change of Name
- ☐ 153 Transcript of Judgment
- ☐ 154 Foreign Judgment
- ☐ 158 Quiet Title
- ☐ 160 Forfeiture
- ☐ 175 Election Challenge
- ☐ 179 NCC-Employer Sanction Action
  (A.R.S. §23-212)
- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream Adjudication)
- ☐ 187 Real Property
- ☐ Special Action against Lower Courts
  (See lower court appeal cover sheet in Maricopa)

- ☐ 194 Immigration Enforcement Challenge
  (§§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL:

- ☐ Administrative Review
  (See lower court appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute- Other
- ☐ 190 Declaration of Factual Innocence
  (A.R.S. §12-771)
- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain– Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☐ 183 Employment Dispute- Discrimination
- ☐ 185 Employment Dispute-Other
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☐ 163 Other _____
  (Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- ☐ Antitrust/Trade Regulation
- ☐ Construction Defect with many parties or structures
- ☐ Mass Tort
- ☐ Securities Litigation with many parties
- ☐ Environmental Toxic Tort with many parties
- ☐ Class Action Claims
- ☐ Insurance Coverage Claims arising from the above-listed case types
- ☒ A Complex Case as defined by Rule 8(h) ARCP

**Additional Plaintiff(s)**

Gray Meyer Fannin LLC  (c/o Stinson Leonard Street LLP, 1850 N. Central Ave., #2100, Phoenix, AZ 85004)

ROI Properties, LLC, Liquidating Trustee of the May Liquidating Trust (c/o Stinson Leonard Street LLP)

**Additional Defendant(s)**

_____

_____

# Exhibit A-5



CHRIS DEROSE
Clerk of the Superior Court
By Jenela Fierro, Deputy
Date 05/11/2018 Time 16:57:46
Description                    Amount
---------- CASE# CV2018-007464 ----------
CIVIL NEW COMPLAINT            322.00
--------------------------------------
TOTAL AMOUNT                   322.00
Receipt# 26585598

Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
Stefan Palys (#024752)
James Camoriano (#034181)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
Tel:  (602) 279-1600
Fax:  (602) 240-6925
michael.manning@stinson.com
jeffrey.goulder@stinson.com
stefan.palys@stinson.com
james.camoriano@stinson.com
*Attorneys for Plaintiffs*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

|  |  |
|---|---|
| EPICENTER PARTNERS LLC and GRAY MEYER FANNIN LLC, by and through ROI PROPERTIES, LLC, LIQUIDATING TRUSTEE OF THE MAY LIQUIDATING TRUST,<br><br>Plaintiffs,<br><br>vs.<br><br>BURFORD CAPITAL LTD., and GANYMEDE INVESTMENTS LTD.,<br><br>Defendants. | No.   CV 2018-007464<br><br>**COMPLAINT**<br><br>(Commercial Court Eligible) |

Plaintiffs allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Epicenter Partners LLC ("Epicenter") and Gray Meyer Fannin LLC ("Gray" and collectively with Epicenter, "Plaintiffs") are both Arizona limited liability companies that did business in Maricopa County, Arizona at all times relevant to the events giving rise to this complaint.

CORE/3506557.0002/139366490.5

2.      Burford Capital Ltd. ("Burford") is a litigation finance company organized under the laws of Guernsey.

3.      Ganymede Investments Ltd. ("Ganymede") is a closed-ended investment company organized under the laws of Guernsey. Upon information and belief, Ganymede has never had any employees, agents, offices, or operations. Instead, it was a single-asset shell company that acted through, was controlled by, and was directed by, Burford.

4.      Burford and Ganymede (collectively "Defendants") caused acts or events to occur in Maricopa County, Arizona, out of which Plaintiffs' claims arise.

5.      The Court has personal jurisdiction over the parties in this lawsuit.

6.      Venue is proper in this Court pursuant to A.R.S. § 12-401.

7.      This Court has jurisdiction over the subject matter of this action pursuant to Article VI, § 14 of the Arizona Constitution and A.R.S. § 12-123.

8.      Plaintiffs are each debtors in United States Bankruptcy Court for the District of Arizona, Case Nos. 2:16-bk-05493-MCW and 2:16-bk-05494-MCW, which were both commenced on May 16, 2016.

9.      Pursuant to the *Order Confirming Third Amended Joint Plan of Reorganization With Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC*, entered on May 1, 2018, ROI Properties, Inc., as Liquidating Trustee of the May Liquidating Trust, is authorized to pursue the claims in this lawsuit on the Plaintiffs' behalf.

**A.**      **The NPP Litigation.**

10.      On July 7, 1993, Northeast Phoenix Partners ("NPP") entered into Commercial Lease No. 03-52415 with the State of Arizona through the State Land Commissioner regarding approximately 5,700 acres of real property in Phoenix, Arizona located north of the Central Arizona Project Canal and south of Pinnacle Peak Road between 32nd Street and 64th Street.

11.      NPP filed a special action appeal of a City of Phoenix Board of Adjustment decision in Maricopa County Superior Court of Arizona captioned *Desert Ridge Community Association, et al. v. City of Phoenix, et al.*, Case No. LC2007-000011 (the "Action").

2

12.     Plaintiffs filed a Counterclaim, First Amended Counterclaim, and Second Amended Counterclaim in the Action against NPP, Desert Ridge Community Association ("DRCA"), and CityNorth, LLC ("CityNorth"). These counterclaims are hereafter collectively referred to as the "Litigation Claim."

13.     Simpson Thacher & Bartlett, LLP ("STB") represented Plaintiffs in the Action.

**B.     STB Requires Funding—the 2009 Agreement.**

14.     From April 30, 2009 through November 20, 2009, STB had been paid $1,162,885.76 in fees and costs.

15.     Nevertheless, in December 2009, STB told Plaintiffs that STB would withdraw the next morning unless Plaintiffs obtained litigation financing from Burford to immediately pay STB.

16.     Plaintiffs attempted to negotiate with Burford for litigation funding.

17.     During the course of these negotiations, Ganymede did not yet exist.

18.     Ganymede was not formed until December 22, 2009.

19.     Ganymede was formed for the sole purpose of acting as the counter-party on the agreements described herein.

20.     During the course of the negotiations, Burford would not entertain or make any revisions or changes to the agreement forms. The terms were presented on a take-it-or-leave it basis.

21.     On December 22, 2009, the day Burford ostensibly formed Ganymede, Plaintiffs entered into a Forward Purchase Agreement with it regarding the Litigation Claim ("2009 Agreement").

22.     Through the 2009 Agreement, Defendants agreed to fund $5 million to be applied to STB's fees in exchange for Plaintiffs granting a contingent interest in any recovery from the Litigation Claim.

23.     On December 22, 2009, STB amended its engagement letter with Plaintiffs. The amendment was negotiated between Defendants and STB without Plaintiffs' participation, and

3

1  was thereafter presented to Plaintiffs as a negotiated agreement, in which Plaintiffs had no
2  choice.

3       24.    The December 22, 2009 letter provided that STB would reimburse itself for all
4  past due fees and disbursements, and would deduct future invoices, from the $4 million
5  deposit from Defendants; and that, in the event of a judgment in excess of a stated amount,
6  that STB would be entitled to a fee "premium."

7       25.    Once STB starting receiving payment from Defendants, STB's billings rose
8  suddenly and dramatically in amount, so that they were quickly triple the amount of the prior
9  billings.

10      26.    Defendants made no effort to control litigation costs with STB, though they had
11  the right to do so.

12      27.    In May 2010, less than five months after the 2009 Agreement, Plaintiffs reached
13  a settlement of a portion of the Litigation Claim with DRCA for approximately $6,000,000, of
14  which $4,000,000 was paid to Defendants. The other $2 million, on information and belief,
15  was paid to STB for invoices owed.

16      28.    Consequently, less than five months after execution of the December 2009
17  Agreement, Defendants were repaid such that its net cash investment was $1,000,000, for
18  which the 2009 Agreement granted them a 40% interest in the Litigation Claim.

19  **C.    The 2010 Agreement.**

20      29.    STB's bills continued to rise, unchecked by Defendants.

21      30.    STB continued to threaten to resign unless Plaintiffs entered into further
22  agreements with Defendants so Plaintiffs were forced to do so.

23      31.    The parties entered into a Restated and Amended Forward Purchase Agreement
24  regarding the Litigation Claim on August 3, 2010 (the "2010 Agreement").[1]

25

26

27  [1] Capitalized terms that are not otherwise defined in this complaint have the meaning ascribed
28  to them in the referenced contracts.

4

32.     Under the 2010 Agreement, Defendants agreed to increase their funding of STB, in exchange for additional returns from the Litigation Claim.

33.     On October 19, 2010, Plaintiffs obtained final judgment in the State Court on the Litigation Claim against NPP and CityNorth in the amount of $110,658,800 plus interest.

34.     After this time, STB continued to represent Plaintiffs to collect on this judgment.

35.     During post-judgment collections, STB continued to charge Plaintiffs exorbitant fees and threaten to withdraw if they were not quickly paid, as a result of which Plaintiffs were forced to enter into further agreements with Defendants in January, October, and December of 2011. The amendments entitled Defendants to greater returns from the Litigation Claim, and extended the deadlines for payment.

36.     By December 2011, Defendants had paid $6,775,000 in legal fees, but had been repaid all but $2,775,000 of that amount.

**D.     Settlement of the Litigation Claim With NPP and Execution of Notes.**

37.     On May 31, 2012, Plaintiffs negotiated a Settlement Agreement with respect to the Litigation Claim which provided that Plaintiffs would receive Assignment of the Lessee's Rights under the terms of the Arizona State Land Department ("ASLD") Commercial Lease No. 03-52415, the assignment of the Master Development Rights, the assignment of the Declarant's Rights and all intellectual property related thereto (collectively, such property interests shall hereafter be referred to as the "Estates' Property").

38.     Upon information and belief, at this time the real estate portion of the Estates' Property alone was worth well in excess of $100 million.

39.     Immediately upon learning of the NPP settlement, Defendants began demanding immediate cash payment from Plaintiffs based on the incorrect position that the agreements required cash payment upon settlement.

40.     The settlement, however, transferred the lessee's rights under Commercial Lease No. 03-52415 to Plaintiffs, and so was not a settlement that included a payment of cash.

5

41. Nevertheless, Defendants threatened to declare a default under the agreements with Plaintiffs and sue Plaintiffs if Plaintiffs did not agree to a resolution.

42. Defendants and Plaintiffs therefore executed an "Outline of Terms" dated December 12, 2012. In that Outline, Defendants set forth terms under which they proposed to convert the Preferred Return plus 40% "interest" in the Litigation Claim (referred to in the 2011 Supplemental Agreement as the Resolution Amount), into a "Liquidated Sum." The Outline of Terms:

a. States that, "[a]s of September 30, 2012, the total amount owing by Gray (Debtors) to Ganymede (Ganymede) is agreed to be $50,713,000 ('Liquidated Sum'). The Liquidated Sum shall be subject to a discount for early payment as set forth on the attached Exhibit 'A' and shall be decreased by the amount of any Net Proceeds and Gray Cash Payments as defined below. The Discount for early payment shall apply only if the payment is made by the applicable date set forth on Exhibit A."

b. At the date of the Outline of Terms, Exhibit A would have required payment to Defendants of $16,419,000.

c. The Outline of Terms required the Total Amount to be secured by a first position deed of trust on, and a lien upon, all of the Estates' Property, not just 40% of the Estates' Property.

d. The Outline required payment of $37,612,000 by December 31, 2015, or declared that the Total Amount would thereafter bear interest at 35% compounded monthly.

43. Plaintiffs executed a Promissory Note dated April 22, 2013, in the amount of $50,713,000 (the "Note"). The Note states that it is governed by Arizona law.

44. Defendants concocted the contrived "debt" structure and the fictitious $50,713,000 amount owed. In part, such structure was demanded by Defendants for the purpose of minimizing United States taxes. In fact, at the time the Note was executed,

6

1 | Defendants had only actually lent $2,775,000.  Reflecting that amount as the debt, however,
2 | would have shown that Defendants were subject to taxable gains on the $47,938,000 profit
3 | they stood to make on the Note.

4 |     45.    Defendant did not advance any additional funds to or for the benefit of Plaintiffs
5 | at the time of the executing of the Note.

6 |     46.    Plaintiffs executed a deed of trust to secure the Note, which encumbered all of
7 | the Estates' Property.  That deed of trust states that it is governed by Arizona law, and it was
8 | recorded with the Maricopa County Recorder.

9 |     47.    On September 26, 2013, Plaintiffs and Defendants entered into an agreement
10 | through which Ganymede received payment of $1,349,233 in exchange for a release of a
11 | portion of property from the deed of trust.

12 |     48.    After that payment, the net capital invested by Defendants in the pursuit of the
13 | Litigation Claim by Plaintiffs was, on information and belief, approximately $1,425,767.

14 | **E.**    **Defendants Publicly Market the Note, Harming Plaintiffs.**

15 |     49.    Upon information and belief, by March 2015, and despite their custom and
16 | practice of modifying and extending Plaintiffs' payment obligations, Defendants decided that
17 | they did not wish to even wait until the maturity date of the Note to get repaid.

18 |     50.    At this time, Plaintiffs were not in default of any obligations under the Note.

19 |     51.    Instead, upon information and belief, Defendants decided that they would rather
20 | sell the Note at a discount than wait for payment in full.  At the time, Defendants only had an
21 | investment of approximately $1.43 million in a note with a face amount of more than $50
22 | million.

23 |     52.    In or around March 2015, Defendants began an aggressive and highly public
24 | advertisement of the Note.

25 |     53.    Defendants hired a broker, HFF, to help them market the Note.

7

54.     HFF's marketing materials were publicly circulated with one or more widely disseminated email "blasts" that went to virtually everyone who was even tangentially connected to the Phoenix real estate market.

55.     Upon information and belief, an agent of Burford acting for the benefit of all Defendants instructed HFF to send the email blast to its vast group of recipients.

56.     Upon information and belief, Defendants gave this instruction despite knowing Plaintiffs were actively engaged in negotiations with credible buyers and simultaneously working with prospective lenders to satisfy the Note.

57.     The HFF materials stated that the asking price for the $50 million Note was $30.6 million.

58.     Defendants knew, or should have known, that advertising the Note at an asking price well below the Note's face value would signal to participants in the Arizona real estate market – including all recipients of the email blast – that Plaintiffs were in financial distress.

59.     In the face of that unmistakable signal, no reasonable buyer would enter into a transaction with Plaintiffs because of the perceived risk that Plaintiffs would default.

60.     Similarly, no buyer would pay a market price for the real property collateral (which was worth several times the face amount of the Note), or refinance the debt (with face amounts of $50,713,000 and $2,956,703.66) when the senior note was being advertised on the open market for $30.6 million.

61.     It was obvious to prospective purchasers that a price of $30.6 million for the Note and deed of trust could, upon default, translate to a price of $7.28/square foot for the real estate – 75-85% less than the land was actually worth at that time.

62.     Upon information and belief, Defendants additionally authorized HFF to widely disseminate the Note.  Consequently, prospective buyers and lenders knew the interest rate Plaintiffs were paying.  With knowledge of that rate, prospective buyers no longer wished to deal with Plaintiffs as those buyers thought Plaintiffs were at imminent risk of default, at which time buyers could purchase the land for far less than its market value.  Additionally,

8

1   lenders who had previously been negotiating low double-digit rates suddenly demanded
2   exponentially more.

3       63.     Consequently, Defendants' marketing efforts, including the email blast,
4   prevented Plaintiffs from entering into a transaction through which they could have refinanced
5   or extinguished the Note.

6       64.     Prior to HFF's email blast, the Arizona real estate market had begun to show
7   signs of recovery.

8       65.     The HFF marketing immediately caused the Estates' Property and Plaintiffs
9   themselves to be viewed as distressed.

10      66.     HFF, at Defendants' direction and with their consent, included the maturity date
11  of the Note in its email blast.

12      67.     As a result, the market became aware of Note's December 31, 2015 maturity
13  date.  The market was unaware of such information prior to the HFF marketing and its highly
14  public "email blasts."  Plaintiffs' ability to protect its interests by selling a portion of the
15  Estates' Property to satisfy or refinance the Ganymede Note was destroyed virtually overnight.

16      68.     On January 14, 2016, a Notice of Trustee's Sale and Notification of Disposition
17  of Personal Property was recorded with the Maricopa County Recorder (2016-0026295)
18  regarding approximately 98 acres of vacant property located west of 56th Street and north of
19  the Loop 101 in Phoenix, Arizona (Tax parcel no. 212-32-100G) and the balance of the
20  Estates' Property.  Plaintiffs will lose the Estates' Property through that sale.

21      **F.     Defendants Sell the Claims to CPF.**

22      69.     CPF Vaseo Associates, LLC ("CPF") and Defendants entered into a Sale and
23  Assignment Agreement, dated March 23, 2016 (hereafter, the "Sale Agreement").

24      70.     Under that Sale Agreement, CPF contracted to purchase the claims of
25  Defendants, who had by then acquired STB's claim, for a very substantial discount.

26      71.     On March 30, 2016, after signing the Sale Agreement, CPF was so pleased with
27  the purchase terms that Mr. Robert Flaxman (on behalf of CPF) contacted a possible investor

28
                                        9

by email stating that, "I have a juicy new deal.  Deep distress and big upside.  When can we connect?"

72.     On May 13, 2016, counsel for CPF sent correspondence to counsel for Plaintiffs notifying Plaintiffs that the claimed payoff amount as of May 16, 2016 for the Note was a total of $54,853,149.17, plus interest accruing at $52,440.74 per day thereafter.  The same correspondence notified Plaintiffs that the claimed payoff amount for the STB Note as of May 16, 2016 was $3,674,319.86, plus interest accruing at $610.76 per day thereafter.

## COUNT I

### Declaratory Relief

73.     Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

74.     Upon information and belief, Ganymede was inadequately capitalized for its business.

75.     At all times relevant to this litigation, Ganymede failed to maintain corporate formalities.

76.     At all times relevant to this litigation, Burford continuously demonstrated a complete and utter lack of adherence to the separate legal personalities of itself and Ganymede by making all high-level decisions on Ganymede's behalf in its dealings with Plaintiffs.

77.     Further, upon information and belief, Burford and Ganymede failed to honor Ganymede's corporate form.

78.     Burford exercised substantially total control over the management and activities of Ganymede during Ganymede's entire existence as a corporate legal entity. Ganymede had no separate mind, will, or existence of its own, but instead its sole purpose was to serve as a business conduit for Burford during its dealings with Plaintiffs.

79.     During the dealings with Plaintiffs in which Ganymede was the named party to the agreements, Burford representatives completely disregarded Ganymede's separate legal personality by directly communicating with Plaintiffs on Ganymede's behalf, approving

10

CORE/3506557.0002/139366490.5

Ganymede's transactions through Burford's own board, and referring to Burford as Plaintiffs' creditor despite Ganymede's status as the secured party of record.

80.     For example, in discussions about the necessity of a "pre-negotiation letter" and the terms therein, Plaintiffs negotiated and communicated exclusively with Burford.

81.     In the discussions addressing the terms of the pre-negotiation letter, Burford informed Plaintiffs that "[w]e are not asking you to give up rights you now have (we don't see how you could possibly have a claim against us). We simply want you to acknowledge that the debt is coming due and you don't have claims against us – a standard request for a creditor whose debtor wants to negotiate a forbearance." The person writing the word "we" worked for Burford and was using it to refer to Burford, not Ganymede.

82.     In discussions addressing Plaintiffs' closing of an outlet mall sale to pay down the Note, Burford mentioned the Burford board's ability to vary the terms of the deal as well as the Burford board's desire to gain extra returns on the deal if the closing were delayed beyond September 2014.

83.     In the discussions addressing Plaintiffs' paydown to the Note, Burford informed Plaintiffs that Burford and STB had reached an agreement that permitted Burford, not Ganymede, to accept an offer by a particular date and have Plaintiffs roll the STB Note into a new note for the same value with new security.

84.     In the discussions addressing Plaintiffs' paydown of the Note, Burford informed Plaintiffs that Burford's board had given their final approval and the deal was ready to close.

85.     In later negotiations relating to Ganymede's Note, on which Ganymede was the payee, Burford told Plaintiffs that their "ideal source of financing would be an entity with a lower cost of capital, and lower return expectations than Burford."

86.     Burford intended to utilize Ganymede as nothing more than a shell company, and made these intentions known by approving Ganymede's purported transactions with its own board as well as referring to itself as Plaintiffs' creditor despite Ganymede's status as the secured party of record.

11

87.     Observance of the separate legal personalities of Burford and Ganymede would sanction fraud and promote injustice against Plaintiffs.

88.     Plaintiffs are entitled to pierce the corporate veil between Burford and Ganymede, and hold Burford liable for all damages suffered by Plaintiffs as a result of its conduct.

89.     Plaintiffs are entitled to a declaration that Ganymede's corporate veil may be disregarded as a mere alter ego of Burford.

90.     Disregarding Ganymede's separate legal status is necessary to prevent injustice.

91.     There is an actual and justiciable controversy between Plaintiffs and Defendants concerning whether Burford owes Plaintiffs a contractual duty of good faith and fair dealing under the Note.

92.     Plaintiffs are entitled to a declaration that Burford owed Plaintiffs a contractual duty of good faith and fair dealing pursuant to the Note.

93.     This declaratory judgment action arises out of contract, so Plaintiffs are entitled to attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## COUNT II

### Breach of the Duty of Good Faith and Fair Dealing

94.     Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

95.     The duty to comply with the implied covenant of good faith and fair dealing is implied in all contracts, including the Note.

96.     Defendants breached their duty of good faith and fair dealing by taking actions inconsistent with the agreed upon purpose and reasonable expectations of the parties when entering the Note.

97.     Under the Note, Plaintiffs were to have the benefit of the originally advanced funds, with no obligation to repay until the agreed-upon maturity date.

98.     Defendants established a routine practice of granting extensions to the maturity date during the parties' prior course of dealing.

12

99.     Then, without notice to Plaintiffs, Defendants decided that they did not want to wait even for the maturity date to be repaid.

100.    Defendants decided they would instead prefer to get paid sooner, and therefore took steps to suggest to participants in the Arizona real estate market that the debt was distressed.   Defendants were willing to accept less than face value for the Note because Defendants only had a net investment of approximately $1.43 million in the Note, consequently would reap an enormous profit even if they sold their interest for less than the $50 million face amount.

101.    Defendants knew that doing this would prevent Plaintiffs from engaging in an orderly liquidation of a portion of the Estates' Property or the refinancing necessary to satisfy the Note.

102.    Defendants knew that Plaintiffs would instead become likely to lose all of the Estates' Property.

103.    Defendants breached the duty of good faith and fair dealing by interfering with Plaintiffs' ability and right to repay the Note when due.

104.    As a direct and proximate cause of Defendants' conduct, Plaintiffs were damaged in an amount to be proven at trial, but in excess of $200 million through the loss of the Estates' Property.

105.    These damages arose naturally from Defendants' breach of the duty of good faith and fair dealing, were foreseeable, and were reasonably within the contemplation of the parties at the time they entered into the Note.

**COUNT III**

**Tortious Interference with Prospective Business Expectancy**

106.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

107.    Plaintiffs had a valid business expectancy in selling part of the Estates' Property to pay off or refinance the Note.

13

1    108.   Burford was aware that Plaintiffs had a valid business expectancy in selling part

2  of the Estates' Property to satisfy or refinance the Note.

3    109.   Burford knew that Plaintiffs were in on-going negotiations with specific buyers

4  to sell part of the Estates' Property to satisfy or refinance the Note.

5    110.   While knowing of Plaintiffs' valid business expectancy and on-going

6  negotiations with prospective purchasers, Burford directed HFF to send the email "blast"

7  advertising the Note for sale at a substantial discount.

8    111.   Through its publicly broadcasted marketing efforts, including the HFF email

9  blast, Burford intentionally and wrongfully interfered with Plaintiffs' ability to market the

10  Estates' Property, and thereby destroyed Plaintiffs' prospective business expectancy.

11    112.   As a direct and proximate result of Burford's tortious interference with

12  Plaintiffs' valid business expectancy, Plaintiffs have suffered damages in an amount to be

13  determined at trial, but in excess of $200 million.

14  **DAMAGES**

15  Wherefore, Plaintiffs pray for entry of a judgment granting relief as follows:

16  A.   For orders declaring the parties' rights in Plaintiffs' favor as described above;

17  B.   For damages in an amount to be proven at trial;

18  C.   For pre- and post-judgment interest;

19  D.   Costs and attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01;

20  E.   For such other and further relief as the Court determines just and necessary to

21  provide Plaintiffs with a complete remedy under the circumstances.

22  RESPECTFULLY SUBMITTED this 11th day of May, 2018.

23  STINSON LEONARD STREET LLP

24

25  Michael C. Manning
    Jeffrey J. Goulder

26  Stefan M. Palys
    James Camoriano

27  1850 N Central Ave., Ste. 2100
    Phoenix, AZ 85004
    *Attorneys for Plaintiffs*

28

14

# Exhibit A-6

Chris DeRose, Clerk of Court
*** Electronically Filed ***
T. Hays, Deputy
5/15/2018 1:40:00 PM
Filing ID 9346765

1  Michael C. Manning (#016255)
   Jeffrey Goulder (#010258)
2  Stefan Palys (#024752)
   James Camoriano (#034181)
3  **STINSON LEONARD STREET LLP**
4  1850 N. Central Avenue, Suite 2100
   Phoenix, Arizona  85004-4584
5  Tel:  (602) 279-1600
6  Fax:  (602) 240-6925
   michael.manning@stinson.com
7  jeffrey.goulder@stinson.com
   stefan.palys@stinson.com
8  james.camoriano@stinson.com
9  *Attorneys for Plaintiff*

10              **SUPERIOR COURT OF ARIZONA**

11                  **MARICOPA COUNTY**

12

13  R.O.I. PROPERTIES, INC. as          No.:  CV2018-007464
    Liquidating Trustee of the estates of
14  EPICENTER PARTNERS, L.L.C. and      **FIRST AMENDED COMPLAINT**
    GRAY MEYER FANNIN, L.L.C.,
15                                       (Commercial Court Eligible)
16              Plaintiff,

17      vs.

18  BURFORD CAPITAL LTD., and
19  GANYMEDE INVESTMENTS LTD.,

20              Defendants.

21      Plaintiff alleges as follows:

22          **PARTIES, JURISDICTION AND VENUE**

23      1.     Epicenter Partners LLC ("Epicenter") and Gray Meyer Fannin LLC ("Gray") are

24  both Arizona limited liability companies that did business in Maricopa County, Arizona at all

25  times relevant to the events giving rise to this complaint.

26      2.     Burford Capital Ltd. ("Burford") is a litigation finance company organized under

27  the laws of Guernsey.

28

CORE/3506557.0002/139366490.6

3.      Ganymede Investments Ltd. ("Ganymede") is a closed-ended investment company organized under the laws of Guernsey.  Upon information and belief, Ganymede has never had any employees, agents, offices, or operations.  Instead, it was a single-asset shell company that acted through, was controlled by, and was directed by, Burford.

4.      Burford and Ganymede (collectively "Defendants") caused acts or events to occur in Maricopa County, Arizona, out of which Plaintiffs' claims arise.

5.      The Court has personal jurisdiction over the parties in this lawsuit.

6.      Venue is proper in this Court pursuant to A.R.S. § 12-401.

7.      This Court has jurisdiction over the subject matter of this action pursuant to Article VI, § 14 of the Arizona Constitution and A.R.S. § 12-123.

8.      Epicenter and Gray each commenced a bankruptcy case in the United States Bankruptcy Court for the District of Arizona, Case Nos. 2:16-bk-05493-MCW and 2:16-bk-05494-MCW, on May 16, 2016.

9.      Pursuant to the "Order Confirming Third Amended Joint Plan of Reorganization with Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC," ROI Properties, Inc., as Liquidating Trustee ("Plaintiff"), is authorized to pursue the claims listed below on behalf of Epicenter and Gray.

**A.      The NPP Litigation.**

10.     On July 7, 1993, Northeast Phoenix Partners ("NPP") entered into Commercial Lease No. 03-52415 with the State of Arizona through the State Land Commissioner regarding approximately 5,700 acres of real property in Phoenix, Arizona located north of the Central Arizona Project Canal and south of Pinnacle Peak Road between 32nd Street and 64th Street.

11.     NPP filed a special action appeal of a City of Phoenix Board of Adjustment decision in Maricopa County Superior Court of Arizona captioned *Desert Ridge Community Association, et al. v. City of Phoenix, et al.*, Case No. LC2007-000011 (the "Action").

12.     Epicenter and Gray filed a Counterclaim, First Amended Counterclaim, and Second Amended Counterclaim in the Action against NPP, Desert Ridge Community

2

CORE/3506557.0002/139366490.6

Association ("DRCA"), and CityNorth, LLC ("CityNorth").   These counterclaims are hereafter collectively referred to as the "Litigation Claim."

13.    Simpson Thacher & Bartlett, LLP ("STB") represented Epicenter and Gray in the Action.

**B.    STB Requires Funding—the 2009 Agreement.**

14.    From April 30, 2009 through November 20, 2009, STB had been paid $1,162,885.76 in fees and costs.

15.    Nevertheless, in December 2009, STB told Epicenter and Gray that STB would withdraw the next morning unless Epicenter and Gray obtained litigation financing from Burford to immediately pay STB.

16.    Epicenter and Gray attempted to negotiate with Burford for litigation funding.

17.    During the course of these negotiations, Ganymede did not yet exist.

18.    Ganymede was not formed until December 22, 2009.

19.    Ganymede was formed for the sole purpose of acting as the counter-party on the agreements described herein.

20.    During the course of the negotiations, Burford would not entertain or make any revisions or changes to the agreement forms.  The terms were presented on a take-it-or-leave it basis.

21.    On December 22, 2009, the day Burford ostensibly formed Ganymede, Epicenter and Gray entered into a Forward Purchase Agreement with it regarding the Litigation Claim ("2009 Agreement").

22.    Through the 2009 Agreement, Defendants agreed to provide $5 million in funding to be applied to STB's fees in exchange for Epicenter and Gray granting a contingent interest in any recovery from the Litigation Claim.

23.    On December 22, 2009, STB amended its engagement letter with Epicenter and Gray.  The amendment was negotiated between Defendants and STB without Epicenter's and

3

1   Gray's participation, and was thereafter presented to Epicenter and Gray as a negotiated

2   agreement, in which Epicenter and Gray had no choice.

3          24.    The December 22, 2009 letter provided that STB would reimburse itself for all

4   past due fees and disbursements, and would deduct future invoices, from the $4 million

5   deposit from Defendants; and that, in the event of a judgment in excess of a stated amount,

6   STB would be entitled to a fee "premium."

7          25.    Once STB starting receiving payment from Defendants, STB's billings rose

8   suddenly and dramatically in amount, so that they were quickly triple the amount of the prior

9   billings.

10         26.    Defendants made no effort to control litigation costs with STB, though they had

11  the right to do so.

12         27.    In May 2010, less than five months after the 2009 Agreement, Epicenter and

13  Gray reached a settlement of a portion of the Litigation Claim with DRCA for approximately

14  $6,000,000, of which $4,000,000 was paid to Defendants. The other $2 million, on

15  information and belief, was paid to STB for invoices owed.

16         28.    Consequently, less than five months after execution of the December 2009

17  Agreement, Defendants were repaid such that their net cash investment was $1,000,000, for

18  which the 2009 Agreement granted them a 40% interest in the Litigation Claim.

19         **C.    The 2010 Agreement.**

20         29.    STB's bills continued to rise, unchecked by Defendants.

21         30.    STB continued to threaten to resign unless Epicenter and Gray entered into

22  further agreements with Defendants so Epicenter and Gray were forced to do so.

23         31.    The parties entered into a Restated and Amended Forward Purchase Agreement

24  regarding the Litigation Claim on August 3, 2010 (the "2010 Agreement").[1]

25

26

27  _____

   [1] Capitalized terms that are not otherwise defined in this complaint have the meaning ascribed
28  to them in the referenced contracts.

                                         4

32.     Under the 2010 Agreement, Defendants agreed to increase their funding of STB, in exchange for additional returns from the Litigation Claim.

33.     On October 19, 2010, Epicenter and Gray obtained final judgment in the State Court on the Litigation Claim against NPP and CityNorth in the amount of $110,658,800 plus interest.

34.     After this time, STB continued to represent Epicenter and Gray to collect on this judgment.

35.     During post-judgment collections, STB continued to charge Epicenter and Gray exorbitant fees and threaten to withdraw if they were not quickly paid, as a result of which Epicenter and Gray were forced to enter into further agreements with Defendants in January, October, and December of 2011.  The amendments entitled Defendants to greater returns from the Litigation Claim, and extended the deadlines for payment.

36.     By December 2011, Defendants had paid $6,775,000 in legal fees, but had been repaid all but $2,775,000 of that amount.

**D.      Settlement of the Litigation Claim With NPP and Execution of Notes.**

37.     On May 31, 2012, Epicenter and Gray negotiated a Settlement Agreement with respect to the Litigation Claim which provided that Epicenter and Gray would receive an Assignment of the Lessee's Rights under the terms of the Arizona State Land Department ("ASLD") Commercial Lease No. 03-52415, the assignment of the Master Development Rights, the assignment of the Declarant's Rights and all intellectual property related thereto (collectively, such property interests shall hereafter be referred to as the "Estates' Property").

38.     Upon information and belief, at this time the real estate portion of the Estates' Property alone was worth well in excess of $100 million.

39.     Immediately upon learning of the NPP settlement, Defendants began demanding immediate cash payment from Epicenter and Gray based on the incorrect position that the agreements required cash payment upon settlement.

5

40.     The settlement, however, transferred the lessee's rights under Commercial Lease No. 03-52415 to Epicenter and Gray, and so was not a settlement that included a payment of cash.

41.     Nevertheless, Defendants threatened to declare a default under the agreements with Epicenter and Gray and sue Epicenter and Gray if Epicenter and Gray did not agree to a resolution.

42.     Defendants and Epicenter and Gray therefore executed an "Outline of Terms" dated December 12, 2012.   In that Outline, Defendants set forth terms under which they proposed to convert the Preferred Return plus 40% "interest" in the Litigation Claim (referred to in the 2011 Supplemental Agreement as the Resolution Amount), into a "Liquidated Sum." Following is the critical information contained in or related to the Outline of Terms:

  a. The Outline of Terms states that, "[a]s of September 30, 2012, the total amount owing by Gray (Debtors) to Ganymede (Ganymede) is agreed to be $50,713,000 ('Liquidated Sum').   The Liquidated Sum shall be subject to a discount for early payment as set forth on the attached Exhibit 'A' and shall be decreased by the amount of any Net Proceeds and Gray Cash Payments as defined below.   The Discount for early payment shall apply only if the payment is made by the applicable date set forth on Exhibit A."

  b. At the date of the Outline of Terms, Exhibit A to the Outline of Terms would have required payment to Defendants of $16,419,000.

  c. The Outline of Terms required the Total Amount to be secured by a first position deed of trust on, and a lien upon, all of the Estates' Property, not just 40% of the Estates' Property.

  d. The Outline of Terms required payment of $37,612,000 by December 31, 2015, or declared that the Total Amount would thereafter bear interest at 35% compounded monthly.

6

43.   Epicenter and Gray executed a Promissory Note dated April 22, 2013, in the amount of $50,713,000 (the "Note"). The Note states that it is governed by Arizona law.

44.   Defendants concocted the contrived "debt" structure and the fictitious $50,713,000 amount owed. In part, such structure was demanded by Defendants for the purpose of minimizing United States taxes. In fact, at the time the Note was executed, the net amount loaned by Defendants was only $2,775,000. Reflecting that amount as the debt, however, would have shown that Defendants were subject to taxable gains on the $47,938,000 profit they stood to make on the Note.

45.   Defendants did not advance any additional funds to or for the benefit of Epicenter and Gray at the time the Note was executed.

46.   Epicenter and Gray executed a deed of trust to secure the Note, which encumbered all of the Estates' Property. That deed of trust states that it is governed by Arizona law, and it was recorded with the Maricopa County Recorder.

47.   On September 26, 2013, Epicenter and Gray and Defendants entered into an agreement through which Ganymede received payment of $1,349,233 in exchange for a release of a portion of property from the deed of trust.

48.   After that payment, the net capital invested by Defendants in the pursuit of the Litigation Claim by Epicenter and Gray was, on information and belief, approximately $1,425,767.

**E.    Defendants Publicly Market the Note, Harming Epicenter and Gray.**

49.   Upon information and belief, by March 2015, and despite their custom and practice of modifying and extending Epicenter's and Gray's payment obligations, Defendants decided that they did not wish to even wait until the maturity date of the Note to get repaid.

50.   At this time, Epicenter and Gray were not in default of any obligations under the Note.

51.   Instead, upon information and belief, Defendants decided that they would rather sell the Note at a discount than wait for payment in full. At the time, Defendants only had an

7

1  investment of approximately $1.43 million in a note with a face amount of more than $50
2  million.

3       52.    In or around March 2015, Defendants began an aggressive and highly public
4  advertisement of the Note.

5       53.    Defendants hired a broker, HFF, to help them market the Note.

6       54.    HFF's marketing materials were publicly circulated with one or more widely
7  disseminated email "blasts" that went to virtually everyone who was even tangentially
8  connected to the Phoenix real estate market.

9       55.    Upon information and belief, an agent of Burford acting for the benefit of all
10  Defendants instructed HFF to send the email blast to its vast group of recipients.

11       56.    Upon information and belief, Defendants gave this instruction despite knowing
12  Epicenter and Gray were actively engaged in negotiations with credible buyers and
13  simultaneously working with prospective lenders to satisfy the Note.

14       57.    The HFF materials stated that the asking price for the $50 million Note was
15  $30.6 million.

16       58.    Defendants knew, or should have known, that advertising the Note at an asking
17  price well below the Note's face value would signal to participants in the Arizona real estate
18  market – including all recipients of the email blast – that Epicenter and Gray were in financial
19  distress.

20       59.    In the face of that unmistakable signal, no reasonable buyer would enter into a
21  transaction with Epicenter and Gray because of the perceived risk that Epicenter and Gray
22  would default.

23       60.    Similarly, no buyer would pay a market price for the real property collateral
24  (which was worth several times the face amount of the Note), or refinance the debt (with face
25  amounts of $50,713,000 and $2,956,703.66) when the senior note was being advertised on the
26  open market for $30.6 million.

27

28
                                                 8

61.     It was obvious to prospective purchasers that a price of $30.6 million for the Note and deed of trust could, upon default, translate to a price of $7.28/square foot for the real estate – 75-85% less than the land was actually worth at that time.

62.     Upon information and belief, Defendants additionally authorized HFF to widely disseminate the Note.  Consequently, prospective buyers and lenders knew the interest rate Epicenter and Gray were paying.  With knowledge of that rate, prospective buyers no longer wished to deal with Epicenter and Gray as those buyers thought Epicenter and Gray were at imminent risk of default, at which time buyers could purchase the land for far less than its market value.  Additionally, lenders who had previously been negotiating low double-digit rates suddenly demanded exponentially more.

63.     Consequently, Defendants' marketing efforts, including the email blast, prevented Epicenter and Gray from entering into a transaction through which they could have refinanced or extinguished the Note.

64.     Prior to HFF's email blast, the Arizona real estate market had begun to show signs of recovery.

65.     The HFF marketing immediately caused the Estates' Property and Epicenter and Gray themselves to be viewed as distressed.

66.     HFF, at Defendants' direction and with their consent, included the maturity date of the Note in its email blast.

67.     As a result, the market became aware of the Note's December 31, 2015 maturity date.  The market was unaware of such information prior to the HFF marketing and its highly public "email blasts."  Epicenter's and Gray's ability to protect their interests by selling a portion of the Estates' Property to satisfy or refinance the Ganymede Note was destroyed virtually overnight.

68.     On January 14, 2016, a Notice of Trustee's Sale and Notification of Disposition of Personal Property was recorded with the Maricopa County Recorder (2016-0026295) regarding approximately 98 acres of vacant property located west of 56th Street and north of

9

1  the Loop 101 in Phoenix, Arizona (Tax parcel no. 212-32-100G) and the balance of the

2  Estates' Property.  Epicenter and Gray would have lost the Estates' Property through that sale.

3      **F.**    **Defendants Sell the Claims to CPF.**

4      69.    CPF Vaseo Associates, LLC ("CPF") and Defendants entered into a Sale and

5  Assignment Agreement, dated March 23, 2016 (hereafter, the "Sale Agreement").

6      70.    Under that Sale Agreement, CPF contracted to purchase the claims of

7  Defendants, who had by then acquired STB's claim, for a very substantial discount.

8      71.    On March 30, 2016, after signing the Sale Agreement, CPF was so pleased with

9  the purchase terms that Mr. Robert Flaxman (on behalf of CPF) contacted a possible investor

10  by email stating that, "I have a juicy new deal.  Deep distress and big upside.  When can we

11  connect?"

12      72.    On May 13, 2016, counsel for CPF sent correspondence to counsel for Epicenter

13  and Gray notifying Epicenter and Gray that the claimed payoff amount as of May 16, 2016 for

14  the Note was a total of $54,853,149.17, plus interest accruing at $52,440.74 per day thereafter.

15  The same correspondence notified Epicenter and Gray that the claimed payoff amount for the

16  STB Note as of May 16, 2016 was $3,674,319.86, plus interest accruing at $610.76 per day

17  thereafter.

18                                 **COUNT I**

19                       **Declaratory Relief**

20      73.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

21      74.    Upon information and belief, Ganymede was inadequately capitalized for its

22  business.

23      75.    At all times relevant to this litigation, Ganymede failed to maintain corporate

24  formalities.

25      76.    At all times relevant to this litigation, Burford continuously demonstrated a

26  complete and utter lack of adherence to the separate legal personalities of itself and Ganymede

27

28                                    10

1   by making all high-level decisions on Ganymede's behalf in its dealings with Epicenter and
2   Gray.

3       77.     Further, upon information and belief, Burford and Ganymede failed to honor
4   Ganymede's corporate form.

5       78.     Burford exercised substantially total control over the management and activities
6   of Ganymede during Ganymede's entire existence as a corporate legal entity. Ganymede had
7   no separate mind, will, or existence of its own, but instead its sole purpose was to serve as a
8   business conduit for Burford during its dealings with Epicenter and Gray.

9       79.     During the dealings with Epicenter and Gray in which Ganymede was the named
10  party to the agreements, Burford representatives completely disregarded Ganymede's separate
11  legal personality by directly communicating with Epicenter and Gray on Ganymede's behalf,
12  approving Ganymede's transactions through Burford's own board, and referring to Burford as
13  Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

14      80.     For example, in discussions about the necessity of a "pre-negotiation letter" and
15  the terms therein, Epicenter and Gray negotiated and communicated exclusively with Burford.

16      81.     In the discussions addressing the terms of the pre-negotiation letter, Burford
17  informed Epicenter and Gray that "[w]e are not asking you to give up rights you now have (we
18  don't see how you could possibly have a claim against us). We simply want you to
19  acknowledge that the debt is coming due and you don't have claims against us – a standard
20  request for a creditor whose debtor wants to negotiate a forbearance." The person writing the
21  word "we" worked for Burford and was using it to refer to Burford, not Ganymede.

22      82.     In discussions addressing Epicenter's and Gray's closing of an outlet mall sale to
23  pay down the Note, Burford mentioned the Burford board's ability to vary the terms of the
24  deal as well as the Burford board's desire to gain extra returns on the deal if the closing were
25  delayed beyond September 2014.

26      83.     In the discussions addressing Epicenter's and Gray's paydown of the Note,
27  Burford informed Epicenter and Gray that Burford and STB had reached an agreement that

28                                      11

permitted Burford, not Ganymede, to accept an offer by a particular date and have Epicenter and Gray roll the STB Note into a new note for the same value with new security.

84.     In the discussions addressing Epicenter and Gray's paydown of the Note, Burford informed Epicenter and Gray that Burford's board had given their final approval and the deal was ready to close.

85.     In later negotiations relating to Ganymede's Note, on which Ganymede was the payee, Burford told Epicenter and Gray that their "ideal source of financing would be an entity with a lower cost of capital, and lower return expectations than Burford."

86.     Burford intended to utilize Ganymede as nothing more than a shell company, and made these intentions known by approving Ganymede's purported transactions with its own board as well as referring to itself as Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

87.     Observance of the separate legal personalities of Burford and Ganymede would sanction fraud and promote injustice against Epicenter and Gray.

88.     Epicenter and Gray are entitled to pierce the corporate veil between Burford and Ganymede, and hold Burford liable for all damages suffered by Epicenter and Gray as a result of its conduct.

89.     Epicenter and Gray are entitled to a declaration that Ganymede's corporate veil may be disregarded as a mere alter ego of Burford.

90.     Disregarding Ganymede's separate legal status is necessary to prevent injustice.

91.     There is an actual and justiciable controversy between Epicenter and Gray and Defendants concerning whether Burford owes Epicenter and Gray a contractual duty of good faith and fair dealing under the Note.

92.     Epicenter and Gray are entitled to a declaration that Burford owed Epicenter and Gray a contractual duty of good faith and fair dealing pursuant to the Note.

93.     This declaratory judgment action arises out of contract, so Epicenter and Gray are entitled to attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

12

## COUNT II

### Breach of the Duty of Good Faith and Fair Dealing

94.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

95.    The duty to comply with the implied covenant of good faith and fair dealing is implied in all contracts, including the Note.

96.    Defendants breached their duty of good faith and fair dealing by taking actions inconsistent with the agreed upon purpose and reasonable expectations of the parties when entering into the Note.

97.    Under the Note, Epicenter and Gray were to have the benefit of the originally advanced funds, with no obligation to repay until the agreed-upon maturity date.

98.    Defendants established a routine practice of granting extensions to the maturity date during the parties' prior course of dealing.

99.    Then, without notice to Epicenter and Gray, Defendants decided that they did not want to wait even for the maturity date to be repaid.

100.    Defendants decided they would instead prefer to get paid sooner, and therefore took steps to suggest to participants in the Arizona real estate market that the debt was distressed.  Defendants were willing to accept less than face value for the Note because Defendants only had a net investment of approximately $1.43 million in the Note, and consequently would reap an enormous profit even if they sold their interest for less than the $50 million face amount.

101.    Defendants knew that doing this would prevent Epicenter and Gray from engaging in an orderly liquidation of a portion of the Estates' Property or the refinancing necessary to satisfy the Note.

102.    Defendants knew that Epicenter and Gray would instead become likely to lose all of the Estates' Property.

103.    Defendants breached the duty of good faith and fair dealing by interfering with Epicenter's and Gray's ability and right to repay the Note when due.

13

104.   As a direct and proximate cause of Defendants' conduct, Epicenter and Gray were damaged in an amount to be proven at trial, but in excess of $200 million through the loss of the Estates' Property.

105.   These damages arose naturally from Defendants' breach of the duty of good faith and fair dealing, were foreseeable, and were reasonably within the contemplation of the parties at the time they entered into the Note.

## COUNT III

### Tortious Interference with Prospective Business Expectancy

106.   Plaintiff incorporates the foregoing allegations as though fully set forth herein.

107.   Epicenter and Gray had a valid business expectancy in selling part of the Estates' Property to pay off or refinance the Note.

108.   Burford was aware that Epicenter and Gray had a valid business expectancy in selling part of the Estates' Property to satisfy or refinance the Note.

109.   Burford knew that Epicenter and Gray were in on-going negotiations with specific buyers to sell part of the Estates' Property to satisfy or refinance the Note.

110.   While knowing of Epicenter's and Gray's valid business expectancy and on-going negotiations with prospective purchasers, Burford directed HFF to send the email "blast" advertising the Note for sale at a substantial discount.

111.   Through its publicly broadcasted marketing efforts, including the HFF email blast, Burford intentionally and wrongfully interfered with Epicenter's and Gray's ability to market the Estates' Property, and thereby destroyed Epicenter's and Gray's prospective business expectancy.

112.   As a direct and proximate result of Burford's tortious interference with Epicenter's and Gray's valid business expectancy, Epicenter and Gray have suffered damages in an amount to be determined at trial, but in excess of $200 million.

### **DAMAGES**

Wherefore, Plaintiff prays for entry of a judgment granting relief as follows:

14

1    A.    For orders declaring the parties' rights in Plaintiff's favor as described above;

2    B.    For damages in an amount to be proven at trial;

3    C.    For pre- and post-judgment interest;

4    D.    Costs and attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01; and

5    E.    For such other and further relief as the Court determines just and necessary to

6    provide Plaintiffs with a complete remedy under the circumstances.

7            RESPECTFULLY SUBMITTED this 15th day of May, 2018.

8

9                                    STINSON LEONARD STREET LLP

10                                   /s/ Stefan M. Palys
                                     Michael C. Manning
11                                   Jeffrey J. Goulder
                                     Stefan M. Palys
12                                   James Camoriano
                                     1850 N Central Ave., Ste. 2100
13                                   Phoenix, AZ 85004
                                     Attorneys for Plaintiff
14

15

16   ORIGINAL e-filed via AZTurboCourt
     this 15th day of May, 2018:
17
     Clerk of the Court
18   Maricopa County Superior Court
     201 West Jefferson
19   Phoenix, Arizona  85003

20

21   /s/ Cynthia Fischer

22

23

24

25

26

27

28
                                           15

# Exhibit A-7

Chris DeRose, Clerk of Court
*** Electronically Filed ***
05/21/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2018-007464                                                05/18/2018


                                             CLERK OF THE COURT
HON. RANDALL H. WARNER                            K. Ballard
                                                   Deputy


EPICENTER PARTNERS L L C, et al.          MICHAEL C MANNING

v.

BURFORD CAPITAL LTD, et al.



                                 JUDGE BERGIN



                CASE STATUS MINUTE ENTRY – CIVIL PRESIDING JUDGE



        Plaintiffs have filed a Motion to Designate the Case as Complex.  The court will defer
ruling until the answer is filed and Defendants have an opportunity to respond.

# Exhibit A-8

Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
Stefan Palys (#024752)
James Camoriano (#034181)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
Tel:  (602) 279-1600
Fax: (602) 240-6925
michael.manning@stinson.com
jeffrey.goulder@stinson.com
stefan.palys@stinson.com
james.camoriano@stinson.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| EPICENTER PARTNERS LLC and GRAY MEYER FANNIN LLC, by and through ROI PROPERTIES, LLC, LIQUIDATING TRUSTEE OF THE MAY LIQUIDATING TRUST,<br><br>    Plaintiffs,<br><br>v.<br><br>BURFORD CAPITAL LTD., and GANYMEDE INVESTMENTS LTD.<br><br>    Defendants. | No. CV2018-007464<br><br>***EX PARTE* MOTION FOR EXTENSION OF TIME TO SERVE DEFENDANTS**<br><br>(Commercial Court Eligible)<br><br>(Assigned to Hon. Timothy Thomason)<br><br>**(Expedited Consideration Requested)** |

Under Ariz. R. Civ. P. 4(i), the Court is to extend the deadline to accomplish service when a plaintiff makes a showing of good cause.  Here, Plaintiffs request that the Court extend the current August 9, 2018 deadline by 60 days to accomplish service of Defendants Burford Capital Ltd. and Ganymede Investments Ltd. – both of which are foreign entities incorporated and domiciled in Guernsey.[1]  There is good cause for this extension, as it would further the bankruptcy trustee's mission to maximize recovery for creditors of a related bankruptcy estate, as detailed below.  The claims that are the subject of this complaint, which seeks in excess of $200 million in damages, are going to be sold through an auction in the U.S. Bankruptcy Court

---

[1] Guernsey is an island in the English Channel off the coast of Normandy, France.

on August 7, 2018. There will be insufficient time for the purchaser to accomplish service under the current deadline.

Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. (collectively, the "May Debtors") held certain claims against the Defendants as of their bankruptcy filing on May 16, 2016. On or about May 1, 2018, the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") entered its *Order Confirming Third Amended Joint Plan of Reorganization with Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC* (the "Confirmation Order"). Under the Confirmation Order, the May Debtors' claims against the Defendants transferred to a "May Liquidating Trust" under the management of the Liquidating Trustee. On May 11, 2018, the Liquidating Trustee commenced the above-captioned proceeding against the Defendants. The claims against the Defendants are substantial as they assert that the Defendants' actions have caused more than $200 million in damages.

Since the filing of the Complaint in this action, multiple parties have approached the Liquidating Trustee seeking to purchase the claims against the Defendants. As a trustee of the May Liquidating Trust, the role of the Liquidating Trustee is to liquidate the May Debtors' claims to maximize the recovery for the bankruptcy estate, not necessarily prosecute them. In light of the interest in the claims, on June 29, 2018, the Liquidating Trustee filed the *Liquidating Trustee's Application to Sell a Claim of the Estates Free and Clear of Liens, Claims and Interests and Request for Approval of Bidding Procedures* [Case No. 2:16-bk-05493-MCW; Dkt. No. 1149] (the "Sale Motion"). Pursuant to the Sale Motion, the Liquidating Trustee seeks to sell the claims of Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. against the Defendants. The Liquidating Trustee is seeking to sell the claims against the Defendants pursuant to an auction to be conducted by the Bankruptcy Court on or before August 7, 2018.

Subject to the outcome of the auction, on or around August 7, 2018, the Liquidating Trustee will likely no longer be the owner of the claims against the Defendants. Given that the Defendants reside in Guernsey, there is anticipated to be expenses associated with effectuating

2

service. In order to preserve the resources of the May Debtors' bankruptcy estate, and maximize the return to creditors of the May Debtors, the Liquidating Trustee believes it best to let whoever purchases the claims bear the cost of service and consequently has instructed counsel not to incur those costs now. Under the current deadline of August 9, 2018, any new owner of the claims would have little or no time remaining to effectuate service. Therefore, pursuant to Ariz. R. Civ. P. 4(i), Plaintiffs respectfully request that the Court exercise its broad discretion to extend the time for service by 60 days to facilitate the Liquidating Trustee's efforts to maximize the recovery for the bankruptcy estate.

For the Court's convenience a proposed form of order has been simultaneously submitted herewith. As no party has been served or appeared, Plaintiffs respectfully request the Court consider this filing without awaiting a response.

RESPECTFULLY SUBMITTED this 5th day of July, 2018.

**STINSON LEONARD STREET LLP**

By: */s/ Stefan M. Palys*
Michael C. Manning
Jeffrey J. Goulder
Stefan M. Palys
James Camoriano
1850 N Central Ave., Ste. 2100
Phoenix, AZ 85004
Attorneys for Plaintiffs

3

ORIGINAL e-filed via AZTurboCourt
this 5th day of July, 2018:

Clerk of the Court
Maricopa County Superior Court
101/201 West Jefferson
Phoenix, Arizona  85003

Copy e-delivered via AZTurboCourt
this 5th day of July, 2018, to

The Honorable Timothy Thomason
Maricopa County Superior Court

COPY of the foregoing e-served via
AZTurboCourt this 5th day of July, 2018
to:

Bradley Cosman
Perkins Coie LLP
2901 N. Central Ave., Suite 2000
Phoenix, Arizona 85012-2788
*Attorneys for Defendants*

*/s/ Joanne McClearn*

4

# Exhibit A-9

Granted as Submitted
***See eSignature page***

Chris DeRose, Clerk of Court
*** Electronically Filed ***
D. Charbagi, Deputy
7/12/2018 8:00:00 AM
Filing ID 9504852

Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
Stefan Palys (#024752)
James Camoriano (#034181)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
michael.manning@stinson.com
jeffrey.goulder@stinson.com
stefan.palys@stinson.com
james.camoriano@stinson.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| EPICENTER PARTNERS LLC and GRAY MEYER FANNIN LLC, by and through ROI PROPERTIES, LLC, LIQUIDATING TRUSTEE OF THE MAY LIQUIDATING TRUST,<br><br>        Plaintiffs,<br><br>v.<br><br>BURFORD CAPITAL LTD., and GANYMEDE INVESTMENTS LTD.<br><br>        Defendants. | No. CV2018-007464<br><br>**ORDER** |

Before the Court is Plaintiffs' Ex Parte *Motion for Extension of Time to Serve Defendants* (the "Motion"). For the reasons stated in the Motion, and good cause appearing,

**IT IS HEREBY ORDERED** granting the Motion and extending the time for service of process from August 9, 2018 through, and including, October 8, 2018.

DATED this _____ day of _____, 2018.

_____
Hon. Timothy Thomason
Maricopa County Superior Court Judge

CORE/3506557.0002/141137484.1

eSignature Page 1 of 1

Filing ID: 9504852   Case Number: CV2018-007464
Original Filing ID: 9492090

---

Granted as Submitted



/S/ Timothy Thomason Date: 7/11/2018
Judicial Officer of Superior Court

ENDORSEMENT PAGE

CASE NUMBER: CV2018-007464                SIGNATURE DATE: 7/11/2018

E-FILING ID #: 9504852                          FILED DATE: 7/12/2018 8:00:00 AM

MICHAEL C MANNING

BURFORD CAPITAL LTD
NO ADDRESS ON RECORD

GANYMEDE INVESTMENTS LTD
NO ADDRESS ON RECORD

# Exhibit A-10



# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

**FILED**
07/18/2018
by Superior Court Admin
on behalf of Clerk of the
Superior Court

07/14/2018

COURT ADMINISTRATION

Ct. Admin
Deputy

**Case Number:** CV2018-007464

**Epicenter Partners L L C**

**V.**

**Burford Capital Ltd**

The Judge assigned to this action is the Honorable Timothy Jay Thomason

### NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 05/11/2018 is subject to dismissal pursuant to Rule 4 (i) of the Arizona Rules of Civil Procedure. The deadline for completing service is 08/09/2018. If the time for completing service has not been extended by the court and no defendants have been served by this date, the case will be dismissed without prejudice.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
Case Number: CV2018-007464

| Party Name | Attorney Name | |
|---|---|---|
| Epicenter Partners L L C | Michael C Manning | Bar ID: 016255 |
| Gray Meyer Fannin L L C | Michael C Manning | Bar ID: 016255 |
| R O I Properties Inc | Michael C Manning | Bar ID: 016255 |
| R O I Property L L C | Michael C Manning | Bar ID: 016255 |

# Exhibit A-11

Chris DeRose, Clerk of Court
*** Electronically Filed ***
M. De La Cruz, Deputy
9/14/2018 12:15:00 PM
Filing ID 9706585

Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
Stefan Palys (#024752)
James Camoriano (#034181)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
michael.manning@stinson.com
jeffrey.goulder@stinson.com
stefan.palys@stinson.com
james.camoriano@stinson.com

*Attorneys for Plaintiff*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| ROI PROPERTIES, INC. as Liquidating Trustee of the estates of EPICENTER PARTNERS LLC and GRAY MEYER FANNIN LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BURFORD CAPITAL LTD., and GANYMEDE INVESTMENTS LTD.<br><br>Defendants. | No. CV2018-007464<br><br>***EX PARTE* MOTION FOR:<br>(1) LEAVE TO AMEND THE COMPLAINT TO SUBSTITUTE REAL PARTY IN INTEREST,<br>(2) AN EXTENSION OF TIME TO ACCOMPLISH SERVICE OF PROCESS ON DEFENDANTS, AND<br>(3) AN ORDER PERMITTING SERVICE BY ALTERNATE MEANS**<br><br>(Assigned to Hon. Timothy Thomason) |

Pursuant to Ariz. R. Civ. P. 15(a)(2) and Ariz. R. Civ. P. 17(a), Plaintiff respectfully requests leave to file a Second Amended Complaint to substitute Epicenter Loss Recovery, L.L.C. ("ELR") for R.O.I. Properties, Inc. as Liquidating Trustee (the "Trustee") of the estates of Epicenter Partners, L.L.C. ("Epicenter") and Gray Meyer Fannin, L.L.C. ("GMF"). As the Court may recall from the prior motion to extend the time for service, the claims at issue were the property of the bankruptcy estate of Epicenter and GMF, and were going to be auctioned in the Bankruptcy Court. Through that process, ELR now holds the claim, so this motion seeks to amend the complaint to substitute it as the real party in interest. Plaintiff also respectfully

CORE/3506557.0002/142251640.3

requests this Court to grant ELR a six-month extension of time to accomplish service on Defendants Burford Capital Ltd. and Ganymede Investments Ltd. ("Burford," "Ganymede," and collectively, "Defendants"). This extension is necessary due to the length of time it will take to complete international service of process on these Guernsey entities.

In accordance with Ariz. R. Civ. P. 15(a)(4), a copy of the proposed amended complaint and a redline are attached hereto as Exhibits A and B. A proposed form of order is also submitted herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   **The Court should grant leave to amend to substitute the real party in interest as plaintiff.**

A.   **Background: ELR is the real party in interest under Arizona Rule of Civil Procedure 17(a).**

ELR is the real party in interest under Ariz. R. Civ. P. 17(a) because it is the assignee of the claims in this litigation.

After Defendants caused the events giving rise to the claims asserted in this litigation, Epicenter and GMF commenced Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Arizona, Case Nos. 2:16-bk-05493-MCW and 2:16-bk-05494-MCW. Pursuant to the "Order Confirming Third Amended Joint Plan of Reorganization with Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC" dated May 1, 2018, the Trustee was authorized to pursue these claims, among others.

On August 22, 2018, the Bankruptcy Court approved a settlement of certain disputed claims. Under the terms of the settlement, the Liquidating Trustee was authorized to abandon the claims giving rise to this litigation to "[Epicenter and GMF], Bruce Gray, or their assigns[.]" *See* Order, Exhibit C. On September 10, 2018, Epicenter and GMF executed the assignment of the claims listed in the First Amended Complaint to ELR. *See* Assignment, Exhibit D (exhibit to assignment omitted). Because ELR is the assignee of the substantive claims giving rise to this litigation, ELR is the real party in interest under Rule 17(a).

2

**B.   The proposed amendment is appropriate under Rule 15.**

Rule 15 is the procedural mechanism through which a party can amend to substitute the real party in interest. *See Carranza v. Madrigal*, 237 Ariz. 512, 513, ¶ 1, 354 P.3d 389, 390 (2015). The Trustee therefore seeks leave to file the Second Amended Complaint pursuant to Ariz. R. Civ. P. 15(a)(2), to complete the substitution of ELR as the real party in interest.[1] That rule provides that leave to amend should be freely granted when justice requires it. Amendments to pleadings should be permitted unless there is undue delay, bad faith, undue prejudice, or futility. *MacCollum v. Perkinson*, 185 Ariz. 179, 185, 913 P.2d 1097, 1103 (App. 1996).

Here, none of the factors that would weigh against amendment of the complaint are present. Defendants have been on notice that this lawsuit was forthcoming since counsel for Ganymede (which was a subsidiary of Burford) communicated with Epicenter and GMF in 2016 regarding an adversary proceeding that was related to this litigation. *See* Declaration of James Camoriano, Exhibit E, ¶¶ 2-3. The Trustee later provided filings from this case to the same counsel.[2] Moreover, Defendants would not be prejudiced by the Second Amended Complaint, as they have not yet appeared, and so have not yet begun efforts to defend the claims. The substantive claims themselves remain unchanged from the First Amended Complaint, in any event. Furthermore, no element of undue delay is present here. The Court previously extended the deadline for service in this case to permit the claim to be disposed of through the Bankruptcy Court. *See* Motion to Extend, filed July 5, 2018; Order, filed July 12, 2018. The order disposing of the claims was just entered on August 22, 2018, and the claims were assigned to ELR on September 10, 2018. This motion has been filed less than five days later. Because there are no issues of notice, prejudice, or undue delay that would adversely affect Defendants and the interests of justice would be served by amending the complaint, this

---

[1] The Trustee previously filed its First Amended Complaint as of right.
[2] At that time, that counsel responded that it had not been retained for this litigation.

3

1    Court should grant Plaintiff leave to file the Second Amended Complaint and substitute ELR

2    as the real party in interest.

3    **II.    The Court should extend the deadline for service due to the time it will take to accomplish service pursuant to the Hague Service Convention, and allow service upon Ganymede by alternate means.**

4

5          The Trustee previously obtained an extension of time to accomplish service, after

6    explaining that it wished to avoid having the bankruptcy estate bear the anticipated expenses of

7    serving Defendants in Guernsey. *See* Motion to Extend, filed July 5, 2018; Order, filed July

8    12, 2018. Instead, the Trustee stated that whoever acquired the claim should bear that cost.

9    Consequently, the Court extended the time for service through October 8, 2018. *See* Order,

10   filed July 12, 2018.

11         ELR has now investigated service of Defendants, and anticipates it will take up to four

12   months to do so. Guernsey is a party to the Hague Convention on the Service Abroad of

13   Judicial and Extra-Judicial Documents in Civil or Commercial Matters (the "Hague

14   Convention"). Courts have frequently acknowledged that the length of time required for

15   service under the Hague Convention can often take many months to accomplish. *See Brown v.*

16   *China Integrated Energy, Inc.*, 285 F.R.D. 560, 562–66 (C.D. Cal. 2012) (noting that service

17   of defendant under the Hague Convention would take four to six months); *see also In GLG Life*

18   *tech Corp Securities Litigation*, 287 F.R.D. 262, 266 (S.D.N.Y. 2012) (the length of time

19   required for service under the Hague Convention could take "approximately six to eight

20   months"). ELR's intended process server has informed it that service of process as is required

21   here could take up to four months. *See* Declaration of James Camoriano, Exhibit E at ¶¶ 4-7.

22   Accordingly, an in an abundance of caution, Plaintiff requests that this Court grant a six-month

23   extension of time to accomplish service of process.

24         Service upon Ganymede will entail additional effort. Since Ganymede is a dissolved

25   entity and does not have a currently known address, the Hague Convention does not govern

26   service upon it. *See* Hague Convention, Article 1 ("The Convention shall not apply where the

27   address of the person to be served with the document is not known"); *see also Cardona v.*

28                                                    4

1  *Kreamer*, 255 Ariz. 143, 145, ¶ 8, 235 P.3d 1026, 1028 (2010) (quoting Hague Convention,

2  Article 1); *see also Southwest Metals Co. v. Snedaker*, 59 Ariz. 374, 377-378, 129 P.3d 314,

3  319-230 (1942) (for service of process purposes, a dissolved corporation has no address or

4  residence).   Therefore, because (1) Ganymede's last known address was outside the state of

5  Arizona[3], (2) locating a currently valid address for Ganymede is impossible due to its dissolved

6  entity status, (3) service by publication is the best means practicable under these circumstances

7  for providing notice to Ganymede, and (4) service by publication is not prohibited by

8  international agreement, Plaintiff seeks leave of this Court for ELR to effect service of process

9  upon Ganymede by online publication pursuant to Ariz. R. Civ. P. 4.2(f) and 4.2(i)(2)(D).

10  Process would be served via posting service of the summons continuously for three

11  consecutive months in the online legal notice publication, Global Legal Notices, a website of

12  general circulation which specializes in service by publication. *See* Declaration of James

13  Camoriano, Exhibit E at ¶¶ 6-8 (Guernsey process server informed counsel this is a typical

14  method of service under the circumstances).

15       The Arizona Supreme Court and many other jurisdictions have blessed service by

16  publication as the best available means of serving defendants outside of Arizona and the

17  United States when the defendant's address is unknown. *See Snedaker*, 59 Ariz. at 383, 129

18  P.2d at 318 (approving service on a dissolved Delaware corporation by publication); *accord*

19  *Kott v. Superior Court*, 53 Cal.Rptr.2d 215, 220 (Cal. App. 1996); *Eto v. Muranaka*, 57 P.3d

20  413, 423-424 (Haw. 2002); *S.E.C. v. Shehyn*, 2008 WL 6150322, 4 (S.D.N.Y. 2008).

21       This Court should permit service of process via publication by electronic means, as it is

22  reasonably calculated to give notice and is not prohibited by international agreement. ELR's

23  intended process server's method of service by online publication entails publishing the

24  Complaint, Summons, Order, any notices, and all court-issued documents continuously on the

25  online legal notice publication Global Legal Notices for a period of three consecutive months,

26

27  [3] During its corporate existence, Ganymede's principal place of business was Regency Court, Glategny Esplanade, St. Peter Port, Guernsey GY1 1WW.

28

5

1   which far exceeds Arizona's statutory timeframe for accomplishing traditional service by

2   publication.[4] *See* Declaration of James Camoriano, Exhibit E at ¶¶ 6-8. Moreover, Global

3   Legal Notices would implement additional measures to provide notice to Ganymede by (1)

4   utilizing a system which allows for defendants to Google their own name and locate the legal

5   notice publication, and (2) providing a link to the actual service documents, a feature not

6   offered by traditional newspapers for publication. In essence, this method provides a greater

7   opportunity to give actual notice to Ganymede than service by publication in a traditional

8   newspaper. For these reasons, this Court should permit ELR to effect service of process upon

9   Ganymede through online publication.

10          To ensure Ganymede gets actual notice, Plaintiff additionally proposes to serve process

11  by emailing it to Defendants' counsel at Perkins Coie LLP. Though Perkins Coie had, at one

12  time previously, stated it had not been retained to represent Defendants in this matter, Perkins

13  Coie more recently represented Defendants in negotiating with the Trustee to acquire the

14  claims that are the subject of this lawsuit. After that, Perkins Coie wrote to counsel stating that

15  "[w]hile we are still not currently authorized to accept service, I'm writing to let you know that

16  we are looking into the question with our clients [*i.e.*, Burford and Ganymede] and may have

17  additional information for you within the next few weeks." *See* Email, Exhibit F.  Since

18  Perkins Coie represents Defendants (whether relating to this case, as this recent email suggests;

19  or just on other matters), Perkins Coie will presumably send the process to Defendants and

20  thereby give them actual notice of this matter.

21  **III.    Conclusion.**

22          Based on the foregoing, Plaintiff respectfully requests that this Court authorize the filing

23  of the attached proposed Second Amended Complaint to substitute ELR as the real party in

24  interest under Rule 17(a), and grant ELR a six-month extension of time to serve Defendants

25  ───────────────
    [4] Ariz. R. Civ. P. 4.2(f)(2)(A) provides that "[s]ervice by publication is accomplished by

26  publishing the summons and a statement describing how a copy of the pleading being served

    may be obtained at least once a week for *4 successive weeks* in a newspaper published in the

27  county where the action is pending" (emphasis added).

                                          6

28

under Ariz. R. Civ. P. 4.2(k), in the manner outlined above. A proposed form of order is submitted herewith.

RESPECTFULLY SUBMITTED this 14th day of September, 2018.

**STINSON LEONARD STREET LLP**

By:   */s/ Stefan M. Palys*

Michael C. Manning
Jeffrey J. Goulder
Stefan M. Palys
James Camoriano
1850 N Central Ave., Ste. 2100
Phoenix, AZ 85004
Attorneys for Plaintiffs

ORIGINAL e-filed via AZTurboCourt
this 14th day of September, 2018:

Clerk of the Court
Maricopa County Superior Court
101/201 West Jefferson
Phoenix, Arizona  85003

Copy e-delivered via AZTurboCourt this
14th day of September, 2018, to

The Honorable Timothy Thomason
Maricopa County Superior Court


*/s/ Cynthia Fischer*

7

CORE/3506557.0002/142251640.3

# EXHIBIT A

# EXHIBIT A

1   Michael C. Manning (#016255)
    Jeffrey Goulder (#010258)
2   Stefan Palys (#024752)
    James Camoriano (#034181)
3   **STINSON LEONARD STREET LLP**
4   1850 N. Central Avenue, Suite 2100
    Phoenix, Arizona  85004-4584
5   Tel: (602) 279-1600
6   Fax: (602) 240-6925
    michael.manning@stinson.com
7   jeffrey.goulder@stinson.com
    stefan.palys@stinson.com
8   james.camoriano@stinson.com
9   *Attorneys for Plaintiff*

10                **SUPERIOR COURT OF ARIZONA**

11                    **MARICOPA COUNTY**

12
    Epicenter Loss Recovery, L.L.C.,
13              Plaintiff,                    No.: CV2018-007464

14      vs.                                   **SECOND AMENDED**
                                              **COMPLAINT**
15
    BURFORD CAPITAL LTD., and
16  GANYMEDE INVESTMENTS LTD.,               (Commercial Court Eligible)

17              Defendants.                   (Assigned to Hon. Timothy
                                              Thomason)
18

19

20
            Plaintiff Epicenter Loss Recovery, L.L.C. (hereinafter "Plaintiff") alleges as follows:
21
                  **PARTIES, JURISDICTION AND VENUE**
22
            1.      Epicenter Partners LLC ("Epicenter") and Gray Meyer Fannin LLC ("Gray") are
23
    both Arizona limited liability companies that did business in Maricopa County, Arizona at all
24
    times relevant to the events giving rise to this complaint.
25
            2.      Burford Capital Ltd. ("Burford") is a litigation finance company organized under
26
    the laws of Guernsey.
27

28

CORE/3506557.0002/142353011.1

3.     Ganymede Investments Ltd. ("Ganymede") is a closed-ended investment company organized under the laws of Guernsey. Upon information and belief, Ganymede has never had any employees, agents, offices, or operations. Instead, it was a single-asset shell company that acted through, was controlled by, and was directed by, Burford.

4.     Burford and Ganymede (collectively "Defendants") caused acts or events to occur in Maricopa County, Arizona, out of which Plaintiffs' claims arise.

5.     The Court has personal jurisdiction over the parties in this lawsuit.

6.     Venue is proper in this Court pursuant to A.R.S. § 12-401.

7.     This Court has jurisdiction over the subject matter of this action pursuant to Article VI, § 14 of the Arizona Constitution and A.R.S. § 12-123.

8.     Epicenter and Gray each commenced a bankruptcy case in the United States Bankruptcy Court for the District of Arizona, Case Nos. 2:16-bk-05493-MCW and 2:16-bk-05494-MCW, on May 16, 2016.

9.     Pursuant to the "Order Confirming Third Amended Joint Plan of Reorganization with Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC," ROI Properties, Inc., as Liquidating Trustee, became authorized to pursue the claims listed below on behalf of Epicenter and Gray on May 1, 2018.

10.     On August 22, 2018, the United States Bankruptcy Court for the District of Arizona approved a settlement of disputed claims. Under the terms of the settlement, ROI Properties, Inc. became expressly authorized to abandon the claims listed below to Epicenter, Gray, or their assigns. ROI Properties, Inc. abandoned the claims listed below to Epicenter and Gray pursuant to this settlement.

11.     On August 31, 2018, Epicenter and Gray executed the assignment of the claims listed below to Plaintiff, which now owns these claims.

A.     **The NPP Litigation.**

12.     On July 7, 1993, Northeast Phoenix Partners ("NPP") entered into Commercial Lease No. 03-52415 with the State of Arizona through the State Land Commissioner regarding

2

1   approximately 5,700 acres of real property in Phoenix, Arizona located north of the Central

2   Arizona Project Canal and south of Pinnacle Peak Road between 32nd Street and 64th Street.

3       13.     NPP filed a special action appeal of a City of Phoenix Board of Adjustment

4   decision in Maricopa County Superior Court of Arizona captioned *Desert Ridge Community*

5   *Association, et al. v. City of Phoenix, et al.*, Case No. LC2007-000011 (the "Action").

6       14.     Epicenter and Gray filed a Counterclaim, First Amended Counterclaim, and

7   Second Amended Counterclaim in the Action against NPP, Desert Ridge Community

8   Association ("DRCA"), and CityNorth, LLC ("CityNorth").   These counterclaims are

9   hereafter collectively referred to as the "Litigation Claim."

10      15.     Simpson Thacher & Bartlett, LLP ("STB") represented Epicenter and Gray in

11  the Action.

12      **B.**    **STB Requires Funding—the 2009 Agreement.**

13      16.     From April 30, 2009 through November 20, 2009, STB had been paid

14  $1,162,885.76 in fees and costs.

15      17.     Nevertheless, in December 2009, STB told Epicenter and Gray that STB would

16  withdraw the next morning unless Epicenter and Gray obtained litigation financing from

17  Burford to immediately pay STB.

18      18.     Epicenter and Gray attempted to negotiate with Burford for litigation funding.

19      19.     During the course of these negotiations, Ganymede did not yet exist.

20      20.     Ganymede was not formed until December 22, 2009.

21      21.     Ganymede was formed for the sole purpose of acting as the counter-party on the

22  agreements described herein.

23      22.     During the course of the negotiations, Burford would not entertain or make any

24  revisions or changes to the agreement forms. The terms were presented on a take-it-or-leave it

25  basis.

26

27

28                                              3

23.   On December 22, 2009, the day Burford ostensibly formed Ganymede, Epicenter and Gray entered into a Forward Purchase Agreement with it regarding the Litigation Claim ("2009 Agreement").

24.   Through the 2009 Agreement, Defendants agreed to provide $5 million in funding to be applied to STB's fees in exchange for Epicenter and Gray granting a contingent interest in any recovery from the Litigation Claim.

25.   On December 22, 2009, STB amended its engagement letter with Epicenter and Gray. The amendment was negotiated between Defendants and STB without Epicenter's and Gray's participation, and was thereafter presented to Epicenter and Gray as a negotiated agreement, in which Epicenter and Gray had no choice.

26.   The December 22, 2009 letter provided that STB would reimburse itself for all past due fees and disbursements, and would deduct future invoices, from the $4 million deposit from Defendants; and that, in the event of a judgment in excess of a stated amount, STB would be entitled to a fee "premium."

27.   Once STB starting receiving payment from Defendants, STB's billings rose suddenly and dramatically in amount, so that they were quickly triple the amount of the prior billings.

28.   Defendants made no effort to control litigation costs with STB, though they had the right to do so.

29.   In May 2010, less than five months after the 2009 Agreement, Epicenter and Gray reached a settlement of a portion of the Litigation Claim with DRCA for approximately $6,000,000, of which $4,000,000 was paid to Defendants. The other $2 million, on information and belief, was paid to STB for invoices owed.

30.   Consequently, less than five months after execution of the December 2009 Agreement, Defendants were repaid such that their net cash investment was $1,000,000, for which the 2009 Agreement granted them a 40% interest in the Litigation Claim.

C.   **The 2010 Agreement.**

4

CORE/3506557.0002/142353011.1

31.   STB's bills continued to rise, unchecked by Defendants.

32.   STB continued to threaten to resign unless Epicenter and Gray entered into further agreements with Defendants so Epicenter and Gray were forced to do so.

33.   The parties entered into a Restated and Amended Forward Purchase Agreement regarding the Litigation Claim on August 3, 2010 (the "2010 Agreement").[1]

34.   Under the 2010 Agreement, Defendants agreed to increase their funding of STB, in exchange for additional returns from the Litigation Claim.

35.   On October 19, 2010, Epicenter and Gray obtained final judgment in the State Court on the Litigation Claim against NPP and CityNorth in the amount of $110,658,800 plus interest.

36.   After this time, STB continued to represent Epicenter and Gray to collect on this judgment.

37.   During post-judgment collections, STB continued to charge Epicenter and Gray exorbitant fees and threaten to withdraw if they were not quickly paid, as a result of which Epicenter and Gray were forced to enter into further agreements with Defendants in January, October, and December of 2011.  The amendments entitled Defendants to greater returns from the Litigation Claim, and extended the deadlines for payment.

38.   By December 2011, Defendants had paid $6,775,000 in legal fees, but had been repaid all but $2,775,000 of that amount.

   **D.   Settlement of the Litigation Claim With NPP and Execution of Notes.**

39.   On May 31, 2012, Epicenter and Gray negotiated a Settlement Agreement with respect to the Litigation Claim which provided that Epicenter and Gray would receive an Assignment of the Lessee's Rights under the terms of the Arizona State Land Department ("ASLD") Commercial Lease No. 03-52415, the assignment of the Master Development

---

[1] Capitalized terms that are not otherwise defined in this complaint have the meaning ascribed to them in the referenced contracts.

5

1  Rights, the assignment of the Declarant's Rights and all intellectual property related thereto
2  (collectively, such property interests shall hereafter be referred to as the "Estates' Property").

3    40.    Upon information and belief, at this time the real estate portion of the Estates'
4  Property alone was worth well in excess of $100 million.

5    41.    Immediately upon learning of the NPP settlement, Defendants began demanding
6  immediate cash payment from Epicenter and Gray based on the incorrect position that the
7  agreements required cash payment upon settlement.

8    42.    The settlement, however, transferred the lessee's rights under Commercial Lease
9  No. 03-52415 to Epicenter and Gray, and so was not a settlement that included a payment of
10  cash.

11    43.    Nevertheless, Defendants threatened to declare a default under the agreements
12  with Epicenter and Gray and sue Epicenter and Gray if Epicenter and Gray did not agree to a
13  resolution.

14    44.    Defendants and Epicenter and Gray therefore executed an "Outline of Terms"
15  dated December 12, 2012.  In that Outline, Defendants set forth terms under which they
16  proposed to convert the Preferred Return plus 40% "interest" in the Litigation Claim (referred
17  to in the 2011 Supplemental Agreement as the Resolution Amount), into a "Liquidated Sum."
18  Following is the critical information contained in or related to the Outline of Terms:

19        a. The Outline of Terms states that, "[a]s of September 30, 2012, the total
20        amount owing by Gray (Debtors) to Ganymede (Ganymede) is agreed to be
21        $50,713,000 ('Liquidated Sum').  The Liquidated Sum shall be subject to a
22        discount for early payment as set forth on the attached Exhibit 'A' and shall be
23        decreased by the amount of any Net Proceeds and Gray Cash Payments as
24        defined below.  The Discount for early payment shall apply only if the payment
25        is made by the applicable date set forth on Exhibit A."

26        b. At the date of the Outline of Terms, Exhibit A to the Outline of Terms would
27        have required payment to Defendants of $16,419,000.

28

6

c. The Outline of Terms required the Total Amount to be secured by a first position deed of trust on, and a lien upon, all of the Estates' Property, not just 40% of the Estates' Property.

d. The Outline of Terms required payment of $37,612,000 by December 31, 2015, or declared that the Total Amount would thereafter bear interest at 35% compounded monthly.

45.     Epicenter and Gray executed a Promissory Note dated April 22, 2013, in the amount of $50,713,000 (the "Note"). The Note states that it is governed by Arizona law.

46.     Defendants concocted the contrived "debt" structure and the fictitious $50,713,000 amount owed. In part, such structure was demanded by Defendants for the purpose of minimizing United States taxes. In fact, at the time the Note was executed, the net amount loaned by Defendants was only $2,775,000. Reflecting that amount as the debt, however, would have shown that Defendants were subject to taxable gains on the $47,938,000 profit they stood to make on the Note.

47.     Defendants did not advance any additional funds to or for the benefit of Epicenter and Gray at the time the Note was executed.

48.     Epicenter and Gray executed a deed of trust to secure the Note, which encumbered all of the Estates' Property. That deed of trust states that it is governed by Arizona law, and it was recorded with the Maricopa County Recorder.

49.     On September 26, 2013, Epicenter and Gray and Defendants entered into an agreement through which Ganymede received payment of $1,349,233 in exchange for a release of a portion of property from the deed of trust.

50.     After that payment, the net capital invested by Defendants in the pursuit of the Litigation Claim by Epicenter and Gray was, on information and belief, approximately $1,425,767.

7

CORE/3506557.0002/142353011.1

**E.**    <u>Defendants Publicly Market the Note, Harming Epicenter and Gray.</u>

51.    Upon information and belief, by March 2015, and despite their custom and practice of modifying and extending Epicenter's and Gray's payment obligations, Defendants decided that they did not wish to even wait until the maturity date of the Note to get repaid.

52.    At this time, Epicenter and Gray were not in default of any obligations under the Note.

53.    Instead, upon information and belief, Defendants decided that they would rather sell the Note at a discount than wait for payment in full.  At the time, Defendants only had an investment of approximately $1.43 million in a note with a face amount of more than $50 million.

54.    In or around March 2015, Defendants began an aggressive and highly public advertisement of the Note.

55.    Defendants hired a broker, HFF, to help them market the Note.

56.    HFF's marketing materials were publicly circulated with one or more widely disseminated email "blasts" that went to virtually everyone who was even tangentially connected to the Phoenix real estate market.

57.    Upon information and belief, an agent of Burford acting for the benefit of all Defendants instructed HFF to send the email blast to its vast group of recipients.

58.    Upon information and belief, Defendants gave this instruction despite knowing Epicenter and Gray were actively engaged in negotiations with credible buyers and simultaneously working with prospective lenders to satisfy the Note.

59.    The HFF materials stated that the asking price for the $50 million Note was $30.6 million.

60.    Defendants knew, or should have known, that advertising the Note at an asking price well below the Note's face value would signal to participants in the Arizona real estate market – including all recipients of the email blast – that Epicenter and Gray were in financial distress.

8

CORE/3506557.0002/142353011.1

61.   In the face of that unmistakable signal, no reasonable buyer would enter into a transaction with Epicenter and Gray because of the perceived risk that Epicenter and Gray would default.

62.   Similarly, no buyer would pay a market price for the real property collateral (which was worth several times the face amount of the Note), or refinance the debt (with face amounts of $50,713,000 and $2,956,703.66) when the senior note was being advertised on the open market for $30.6 million.

63.   It was obvious to prospective purchasers that a price of $30.6 million for the Note and deed of trust could, upon default, translate to a price of $7.28/square foot for the real estate – 75-85% less than the land was actually worth at that time.

64.   Upon information and belief, Defendants additionally authorized HFF to widely disseminate the Note. Consequently, prospective buyers and lenders knew the interest rate Epicenter and Gray were paying. With knowledge of that rate, prospective buyers no longer wished to deal with Epicenter and Gray as those buyers thought Epicenter and Gray were at imminent risk of default, at which time buyers could purchase the land for far less than its market value. Additionally, lenders who had previously been negotiating low double-digit rates suddenly demanded exponentially more.

65.   Consequently, Defendants' marketing efforts, including the email blast, prevented Epicenter and Gray from entering into a transaction through which they could have refinanced or extinguished the Note.

66.   Prior to HFF's email blast, the Arizona real estate market had begun to show signs of recovery.

67.   The HFF marketing immediately caused the Estates' Property and Epicenter and Gray themselves to be viewed as distressed.

68.   HFF, at Defendants' direction and with their consent, included the maturity date of the Note in its email blast.

9

1    69.    As a result, the market became aware of the Note's December 31, 2015 maturity

2    date. The market was unaware of such information prior to the HFF marketing and its highly

3    public "email blasts." Epicenter's and Gray's ability to protect their interests by selling a

4    portion of the Estates' Property to satisfy or refinance the Ganymede Note was destroyed

5    virtually overnight.

6    70.    On January 14, 2016, a Notice of Trustee's Sale and Notification of Disposition

7    of Personal Property was recorded with the Maricopa County Recorder (2016-0026295)

8    regarding approximately 98 acres of vacant property located west of 56th Street and north of

9    the Loop 101 in Phoenix, Arizona (Tax parcel no. 212-32-100G) and the balance of the

10   Estates' Property. Epicenter and Gray would have lost the Estates' Property through that sale.

11   **F.    <u>Defendants Sell the Claims to CPF.</u>**

12   71.    CPF Vaseo Associates, LLC ("CPF") and Defendants entered into a Sale and

13   Assignment Agreement, dated March 23, 2016 (hereafter, the "Sale Agreement").

14   72.    Under that Sale Agreement, CPF contracted to purchase the claims of

15   Defendants, who had by then acquired STB's claim, for a very substantial discount.

16   73.    On March 30, 2016, after signing the Sale Agreement, CPF was so pleased with

17   the purchase terms that Mr. Robert Flaxman (on behalf of CPF) contacted a possible investor

18   by email stating that, "I have a juicy new deal. Deep distress and big upside. When can we

19   connect?"

20   74.    On May 13, 2016, counsel for CPF sent correspondence to counsel for Epicenter

21   and Gray notifying Epicenter and Gray that the claimed payoff amount as of May 16, 2016 for

22   the Note was a total of $54,853,149.17, plus interest accruing at $52,440.74 per day thereafter.

23   The same correspondence notified Epicenter and Gray that the claimed payoff amount for the

24   STB Note as of May 16, 2016 was $3,674,319.86, plus interest accruing at $610.76 per day

25   thereafter.

26                                 COUNT I

27                              **Declaratory Relief**

28                                    10

75. Plaintiff incorporates the foregoing allegations as though fully set forth herein.

76. Upon information and belief, Ganymede was inadequately capitalized for its business.

77. At all times relevant to this litigation, Ganymede failed to maintain corporate formalities.

78. At all times relevant to this litigation, Burford continuously demonstrated a complete and utter lack of adherence to the separate legal personalities of itself and Ganymede by making all high-level decisions on Ganymede's behalf in its dealings with Epicenter and Gray.

79. Further, upon information and belief, Burford and Ganymede failed to honor Ganymede's corporate form.

80. Burford exercised substantially total control over the management and activities of Ganymede during Ganymede's entire existence as a corporate legal entity. Ganymede had no separate mind, will, or existence of its own, but instead its sole purpose was to serve as a business conduit for Burford during its dealings with Epicenter and Gray.

81. During the dealings with Epicenter and Gray in which Ganymede was the named party to the agreements, Burford representatives completely disregarded Ganymede's separate legal personality by directly communicating with Epicenter and Gray on Ganymede's behalf, approving Ganymede's transactions through Burford's own board, and referring to Burford as Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

82. For example, in discussions about the necessity of a "pre-negotiation letter" and the terms therein, Epicenter and Gray negotiated and communicated exclusively with Burford.

83. In the discussions addressing the terms of the pre-negotiation letter, Burford informed Epicenter and Gray that "[w]e are not asking you to give up rights you now have (we don't see how you could possibly have a claim against us). We simply want you to acknowledge that the debt is coming due and you don't have claims against us – a standard

11

request for a creditor whose debtor wants to negotiate a forbearance." The person writing the word "we" worked for Burford and was using it to refer to Burford, not Ganymede.

84.     In discussions addressing Epicenter's and Gray's closing of an outlet mall sale to pay down the Note, Burford mentioned the Burford board's ability to vary the terms of the deal as well as the Burford board's desire to gain extra returns on the deal if the closing were delayed beyond September 2014.

85.     In the discussions addressing Epicenter's and Gray's paydown of the Note, Burford informed Epicenter and Gray that Burford and STB had reached an agreement that permitted Burford, not Ganymede, to accept an offer by a particular date and have Epicenter and Gray roll the STB Note into a new note for the same value with new security.

86.     In the discussions addressing Epicenter and Gray's paydown of the Note, Burford informed Epicenter and Gray that Burford's board had given their final approval and the deal was ready to close.

87.     In later negotiations relating to Ganymede's Note, on which Ganymede was the payee, Burford told Epicenter and Gray that their "ideal source of financing would be an entity with a lower cost of capital, and lower return expectations than Burford."

88.     Burford intended to utilize Ganymede as nothing more than a shell company, and made these intentions known by approving Ganymede's purported transactions with its own board as well as referring to itself as Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

89.     Observance of the separate legal personalities of Burford and Ganymede would sanction fraud and promote injustice against Epicenter and Gray.

90.     Epicenter and Gray are entitled to pierce the corporate veil between Burford and Ganymede, and hold Burford liable for all damages suffered by Epicenter and Gray as a result of its conduct.

91.     Epicenter and Gray are entitled to a declaration that Ganymede's corporate veil may be disregarded as a mere alter ego of Burford.

12

92.     Disregarding Ganymede's separate legal status is necessary to prevent injustice.

93.     There is an actual and justiciable controversy between Epicenter and Gray and Defendants concerning whether Burford owes Epicenter and Gray a contractual duty of good faith and fair dealing under the Note.

94.     Epicenter and Gray are entitled to a declaration that Burford owed Epicenter and Gray a contractual duty of good faith and fair dealing pursuant to the Note.

95.     This declaratory judgment action arises out of contract, so Epicenter and Gray are entitled to attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## COUNT II

### Breach of the Duty of Good Faith and Fair Dealing

96.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

97.     The duty to comply with the implied covenant of good faith and fair dealing is implied in all contracts, including the Note.

98.     Defendants breached their duty of good faith and fair dealing by taking actions inconsistent with the agreed upon purpose and reasonable expectations of the parties when entering into the Note.

99.     Under the Note, Epicenter and Gray were to have the benefit of the originally advanced funds, with no obligation to repay until the agreed-upon maturity date.

100.    Defendants established a routine practice of granting extensions to the maturity date during the parties' prior course of dealing.

101.    Then, without notice to Epicenter and Gray, Defendants decided that they did not want to wait even for the maturity date to be repaid.

102.    Defendants decided they would instead prefer to get paid sooner, and therefore took steps to suggest to participants in the Arizona real estate market that the debt was distressed. Defendants were willing to accept less than face value for the Note because Defendants only had a net investment of approximately $1.43 million in the Note, and

CORE/3506557.0002/142353011.1

1  consequently would reap an enormous profit even if they sold their interest for less than the

2  $50 million face amount.

3      103.   Defendants knew that doing this would prevent Epicenter and Gray from

4  engaging in an orderly liquidation of a portion of the Estates' Property or the refinancing

5  necessary to satisfy the Note.

6      104.   Defendants knew that Epicenter and Gray would instead become likely to lose

7  all of the Estates' Property.

8      105.   Defendants breached the duty of good faith and fair dealing by interfering with

9  Epicenter's and Gray's ability and right to repay the Note when due.

10     106.   As a direct and proximate cause of Defendants' conduct, Epicenter and Gray

11  were damaged in an amount to be proven at trial, but in excess of $200 million through the

12  loss of the Estates' Property.

13     107.   These damages arose naturally from Defendants' breach of the duty of good

14  faith and fair dealing, were foreseeable, and were reasonably within the contemplation of the

15  parties at the time they entered into the Note.

16                                  COUNT III

17          Tortious Interference with Prospective Business Expectancy

18     108.   Plaintiff incorporates the foregoing allegations as though fully set forth herein.

19     109.   Epicenter and Gray had a valid business expectancy in selling part of the

20  Estates' Property to pay off or refinance the Note.

21     110.   Burford was aware that Epicenter and Gray had a valid business expectancy in

22  selling part of the Estates' Property to satisfy or refinance the Note.

23     111.   Burford knew that Epicenter and Gray were in on-going negotiations with

24  specific buyers to sell part of the Estates' Property to satisfy or refinance the Note.

25     112.   While knowing of Epicenter's and Gray's valid business expectancy and on-

26  going negotiations with prospective purchasers, Burford directed HFF to send the email

27  "blast" advertising the Note for sale at a substantial discount.

28                                       14

113.    Through its publicly broadcasted marketing efforts, including the HFF email blast, Burford intentionally and wrongfully interfered with Epicenter's and Gray's ability to market the Estates' Property, and thereby destroyed Epicenter's and Gray's prospective business expectancy.

114.    As a direct and proximate result of Burford's tortious interference with Epicenter's and Gray's valid business expectancy, Epicenter and Gray have suffered damages in an amount to be determined at trial, but in excess of $200 million.

## DAMAGES

Wherefore, Plaintiff prays for entry of a judgment granting relief as follows:

A.    For orders declaring the parties' rights in Plaintiff's favor as described above;

B.    For damages in an amount to be proven at trial;

C.    For pre- and post-judgment interest;

D.    Costs and attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01; and

E.    For such other and further relief as the Court determines just and necessary to provide Plaintiffs with a complete remedy under the circumstances.

RESPECTFULLY SUBMITTED this 14th day of September, 2018.


STINSON LEONARD STREET LLP

/s/ *Stefan M. Palys*
Michael C. Manning
Jeffrey J. Goulder
Stefan M. Palys
James Camoriano
1850 N Central Ave., Ste. 2100
Phoenix, AZ 85004
*Attorneys for Plaintiff*


ORIGINAL e-filed via AZTurboCourt
this 14th day of September, 2018:

15

Clerk of the Court
Maricopa County Superior Court
201 West Jefferson
Phoenix, Arizona  85003

/s/ Cynthia Fischer

16

# EXHIBIT B

# EXHIBIT B

1  Michael C. Manning (#016255)
   Jeffrey Goulder (#010258)
2  Stefan Palys (#024752)
   James Camoriano (#034181)
3  **STINSON LEONARD STREET LLP**
4  1850 N. Central Avenue, Suite 2100
   Phoenix, Arizona 85004-4584
5  Tel:  (602) 279-1600
6  Fax:  (602) 240-6925
   michael.manning@stinson.com
7  jeffrey.goulder@stinson.com
   stefan.palys@stinson.com
8  james.camoriano@stinson.com
9  *Attorneys for Plaintiff*

10              **SUPERIOR COURT OF ARIZONA**

11                   **MARICOPA COUNTY**

12
13  ~~R.O.I. PROPERTIES, INC. as~~            No.:  CV2018-007464
    ~~Liquidating Trustee of the estates of~~
14  ~~EPICENTER PARTNERS, L.L.C. and~~        ~~FIRST~~SECOND AMENDED
    ~~GRAY MEYER FANNIN~~Epicenter           **COMPLAINT**
15  Loss Recovery, L.L.C.,
                                             (Commercial Court Eligible)
16                   Plaintiff,
                                             (Assigned to Hon. Timothy
17  vs.                                      Thomason)

18  BURFORD CAPITAL LTD., and
19  GANYMEDE INVESTMENTS LTD.,

20                   Defendants.

21      Plaintiff Epicenter Loss Recovery, L.L.C. (hereinafter "Plaintiff") alleges as follows:

22                **PARTIES, JURISDICTION AND VENUE**

23      1.      Epicenter Partners LLC ("Epicenter") and Gray Meyer Fannin LLC ("Gray") are

24  both Arizona limited liability companies that did business in Maricopa County, Arizona at all

25  times relevant to the events giving rise to this complaint.

26      2.      Burford Capital Ltd. ("Burford") is a litigation finance company organized under

27  the laws of Guernsey.

28

CORE/3506557.0002/143936f490.6142353011.1

3.    Ganymede Investments Ltd. ("Ganymede") is a closed-ended investment company organized under the laws of Guernsey. Upon information and belief, Ganymede has never had any employees, agents, offices, or operations. Instead, it was a single-asset shell company that acted through, was controlled by, and was directed by, Burford.

4.    Burford and Ganymede (collectively "Defendants") caused acts or events to occur in Maricopa County, Arizona, out of which Plaintiffs' claims arise.

5.    The Court has personal jurisdiction over the parties in this lawsuit.

6.    Venue is proper in this Court pursuant to A.R.S. § 12-401.

7.    This Court has jurisdiction over the subject matter of this action pursuant to Article VI, § 14 of the Arizona Constitution and A.R.S. § 12-123.

8.    Epicenter and Gray each commenced a bankruptcy case in the United States Bankruptcy Court for the District of Arizona, Case Nos. 2:16-bk-05493-MCW and 2:16-bk-05494-MCW, on May 16, 2016.

9.    Pursuant to the "Order Confirming Third Amended Joint Plan of Reorganization with Stipulated and Non-Adverse Modifications Proposed by CPF Vaseo Associates, LLC," ROI Properties, Inc., as Liquidating Trustee ("Plaintiff"), is, became authorized to pursue the claims listed below on behalf of Epicenter and Gray on May 1, 2018.

10.    On August 22, 2018, the United States Bankruptcy Court for the District of Arizona approved a settlement of disputed claims. Under the terms of the settlement, ROI Properties, Inc. became expressly authorized to abandon the claims listed below to Epicenter, Gray, or their assigns. ROI Properties, Inc. abandoned the claims listed below to Epicenter and Gray pursuant to this settlement.

11.    On August 31, 2018, Epicenter and Gray executed the assignment of the claims listed below to Plaintiff, which now owns these claims.

A.    **The NPP Litigation.**

12.    10. On July 7, 1993, Northeast Phoenix Partners ("NPP") entered into Commercial Lease No. 03-52415 with the State of Arizona through the State Land

2

1  Commissioner regarding approximately 5,700 acres of real property in Phoenix, Arizona
2  located north of the Central Arizona Project Canal and south of Pinnacle Peak Road between
3  32nd Street and 64th Street.

4      13.   11. NPP filed a special action appeal of a City of Phoenix Board of Adjustment
5  decision in Maricopa County Superior Court of Arizona captioned *Desert Ridge Community*
6  *Association, et al. v. City of Phoenix, et al.*, Case No. LC2007-000011 (the "Action").

7      14.   12. Epicenter and Gray filed a Counterclaim, First Amended Counterclaim, and
8  Second Amended Counterclaim in the Action against NPP, Desert Ridge Community
9  Association ("DRCA"), and CityNorth, LLC ("CityNorth"). These counterclaims are hereafter
10 collectively referred to as the "Litigation Claim."

11     15.   13. Simpson Thacher & Bartlett, LLP ("STB") represented Epicenter and Gray in
12 the Action.

13     **B.    STB Requires Funding—the 2009 Agreement.**

14     16.   14. From April 30, 2009 through November 20, 2009, STB had been paid
15 $1,162,885.76 in fees and costs.

16     17.   15. Nevertheless, in December 2009, STB told Epicenter and Gray that STB
17 would withdraw the next morning unless Epicenter and Gray obtained litigation financing from
18 Burford to immediately pay STB.

19     18.   16. Epicenter and Gray attempted to negotiate with Burford for litigation
20 funding.

21     19.   17. During the course of these negotiations, Ganymede did not yet exist.

22     20.   18. Ganymede was not formed until December 22, 2009.

23     21.   19. Ganymede was formed for the sole purpose of acting as the counter-party on
24 the agreements described herein.

25     22.   20. During the course of the negotiations, Burford would not entertain or make
26 any revisions or changes to the agreement forms. The terms were presented on a take-it-or-
27 leave it basis.

28                                                3

CORE/3506557.0002/139366490.6142353011.1

23. ~~21.~~ On December 22, 2009, the day Burford ostensibly formed Ganymede, Epicenter and Gray entered into a Forward Purchase Agreement with it regarding the Litigation Claim ("2009 Agreement").

24. ~~22.~~ Through the 2009 Agreement, Defendants agreed to provide $5 million in funding to be applied to STB's fees in exchange for Epicenter and Gray granting a contingent interest in any recovery from the Litigation Claim.

25. ~~23.~~ On December 22, 2009, STB amended its engagement letter with Epicenter and Gray.  The amendment was negotiated between Defendants and STB without Epicenter's and Gray's participation, and was thereafter presented to Epicenter and Gray as a negotiated agreement, in which Epicenter and Gray had no choice.

26. ~~24.~~ The December 22, 2009 letter provided that STB would reimburse itself for all past due fees and disbursements, and would deduct future invoices, from the $4 million deposit from Defendants; and that, in the event of a judgment in excess of a stated amount, STB would be entitled to a fee "premium."

27. ~~25.~~ Once STB starting receiving payment from Defendants, STB's billings rose suddenly and dramatically in amount, so that they were quickly triple the amount of the prior billings.

28. ~~26.~~ Defendants made no effort to control litigation costs with STB, though they had the right to do so.

29. ~~27.~~ In May 2010, less than five months after the 2009 Agreement, Epicenter and Gray reached a settlement of a portion of the Litigation Claim with DRCA for approximately $6,000,000, of which $4,000,000 was paid to Defendants. The other $2 million, on information and belief, was paid to STB for invoices owed.

30. ~~28.~~ Consequently, less than five months after execution of the December 2009 Agreement, Defendants were repaid such that their net cash investment was $1,000,000, for which the 2009 Agreement granted them a 40% interest in the Litigation Claim.

C.   **The 2010 Agreement.**

4

1       31.   29. STB's bills continued to rise, unchecked by Defendants.

2       32.   40. STB continued to threaten to resign unless Epicenter and Gray entered into

3 further agreements with Defendants so Epicenter and Gray were forced to do so.

4       33.   31. The parties entered into a Restated and Amended Forward Purchase

5 Agreement regarding the Litigation Claim on August 3, 2010 (the "2010 Agreement").[1]

6       34.   32. Under the 2010 Agreement, Defendants agreed to increase their funding of

7 STB, in exchange for additional returns from the Litigation Claim.

8       35.   33. On October 19, 2010, Epicenter and Gray obtained final judgment in the

9 State Court on the Litigation Claim against NPP and CityNorth in the amount of $110,658,800

10 plus interest.

11      36.   34. After this time, STB continued to represent Epicenter and Gray to collect on

12 this judgment.

13      37.   35. During post-judgment collections, STB continued to charge Epicenter and

14 Gray exorbitant fees and threaten to withdraw if they were not quickly paid, as a result of

15 which Epicenter and Gray were forced to enter into further agreements with Defendants in

16 January, October, and December of 2011.  The amendments entitled Defendants to greater

17 returns from the Litigation Claim, and extended the deadlines for payment.

18      38.   36. By December 2011, Defendants had paid $6,775,000 in legal fees, but had

19 been repaid all but $2,775,000 of that amount.

20     **D.**    **Settlement of the Litigation Claim With NPP and Execution of Notes.**

21      39.   37. On May 31, 2012, Epicenter and Gray negotiated a Settlement Agreement

22 with respect to the Litigation Claim which provided that Epicenter and Gray would receive an

23 Assignment of the Lessee's Rights under the terms of the Arizona State Land Department

24 ("ASLD") Commercial Lease No. 03-52415, the assignment of the Master Development

25

26

27 [1] Capitalized terms that are not otherwise defined in this complaint have the meaning ascribed
to them in the referenced contracts.

28

1 Rights, the assignment of the Declarant's Rights and all intellectual property related thereto

2 (collectively, such property interests shall hereafter be referred to as the "Estates' Property").

3      40.   ~~38.~~ Upon information and belief, at this time the real estate portion of the

4 Estates' Property alone was worth well in excess of $100 million.

5      41.   ~~39.~~ Immediately upon learning of the NPP settlement, Defendants began

6 demanding immediate cash payment from Epicenter and Gray based on the incorrect position

7 that the agreements required cash payment upon settlement.

8      42.   ~~40.~~ The settlement, however, transferred the lessee's rights under Commercial

9 Lease No. 03-52415 to Epicenter and Gray, and so was not a settlement that included a

10 payment of cash.

11      43.   ~~41.~~ Nevertheless, Defendants threatened to declare a default under the

12 agreements with Epicenter and Gray and sue Epicenter and Gray if Epicenter and Gray did not

13 agree to a resolution.

14      44.   ~~42.~~ Defendants and Epicenter and Gray therefore executed an "Outline of

15 Terms" dated December 12, 2012.  In that Outline, Defendants set forth terms under which

16 they proposed to convert the Preferred Return plus 40% "interest" in the Litigation Claim

17 (referred to in the 2011 Supplemental Agreement as the Resolution Amount), into a

18 "Liquidated Sum."  Following is the critical information contained in or related to the Outline

19 of Terms:

20           a. The Outline of Terms states that, "[a]s of September 30, 2012, the total

21           amount owing by Gray (Debtors) to Ganymede (Ganymede) is agreed to be

22           $50,713,000 ('Liquidated Sum').  The Liquidated Sum shall be subject to a

23           discount for early payment as set forth on the attached Exhibit 'A' and shall be

24           decreased by the amount of any Net Proceeds and Gray Cash Payments as

25           defined below.  The Discount for early payment shall apply only if the payment

26           is made by the applicable date set forth on Exhibit A."

27

28                                              6

b. At the date of the Outline of Terms, Exhibit A to the Outline of Terms would have required payment to Defendants of $16,419,000.

c. The Outline of Terms required the Total Amount to be secured by a first position deed of trust on, and a lien upon, all of the Estates' Property, not just 40% of the Estates' Property.

d. The Outline of Terms required payment of $37,612,000 by December 31, 2015, or declared that the Total Amount would thereafter bear interest at 35% compounded monthly.

45.   43. Epicenter and Gray executed a Promissory Note dated April 22, 2013, in the amount of $50,713,000 (the "Note"). The Note states that it is governed by Arizona law.

46.   44. Defendants concocted the contrived "debt" structure and the fictitious $50,713,000 amount owed. In part, such structure was demanded by Defendants for the purpose of minimizing United States taxes. In fact, at the time the Note was executed, the net amount loaned by Defendants was only $2,775,000. Reflecting that amount as the debt, however, would have shown that Defendants were subject to taxable gains on the $47,938,000 profit they stood to make on the Note.

47.   45. Defendants did not advance any additional funds to or for the benefit of Epicenter and Gray at the time the Note was executed.

48.   46. Epicenter and Gray executed a deed of trust to secure the Note, which encumbered all of the Estates' Property. That deed of trust states that it is governed by Arizona law, and it was recorded with the Maricopa County Recorder.

49.   47. On September 26, 2013, Epicenter and Gray and Defendants entered into an agreement through which Ganymede received payment of $1,349,233 in exchange for a release of a portion of property from the deed of trust.

50.   48. After that payment, the net capital invested by Defendants in the pursuit of the Litigation Claim by Epicenter and Gray was, on information and belief, approximately $1,425,767.

7

1      **E.     Defendants Publicly Market the Note, Harming Epicenter and Gray.**

2          51.     49.—Upon information and belief, by March 2015, and despite their custom and

3   practice of modifying and extending Epicenter's and Gray's payment obligations, Defendants

4   decided that they did not wish to even wait until the maturity date of the Note to get repaid.

5          52.     50.—At this time, Epicenter and Gray were not in default of any obligations under

6   the Note.

7          53.     51.—Instead, upon information and belief, Defendants decided that they would

8   rather sell the Note at a discount than wait for payment in full.  At the time, Defendants only

9   had an investment of approximately $1.43 million in a note with a face amount of more than

10  $50 million.

11         54.     52.—In or around March 2015, Defendants began an aggressive and highly public

12  advertisement of the Note.

13         55.     53.—Defendants hired a broker, HFF, to help them market the Note.

14         56.     54.—HFF's marketing materials were publicly circulated with one or more widely

15  disseminated email "blasts" that went to virtually everyone who was even tangentially

16  connected to the Phoenix real estate market.

17         57.     55.—Upon information and belief, an agent of Burford acting for the benefit of all

18  Defendants instructed HFF to send the email blast to its vast group of recipients.

19         58.     56.—Upon information and belief, Defendants gave this instruction despite

20  knowing Epicenter and Gray were actively engaged in negotiations with credible buyers and

21  simultaneously working with prospective lenders to satisfy the Note.

22         59.     57.—The HFF materials stated that the asking price for the $50 million Note was

23  $30.6 million.

24         60.     58.—Defendants knew, or should have known, that advertising the Note at an

25  asking price well below the Note's face value would signal to participants in the Arizona real

26  estate market – including all recipients of the email blast – that Epicenter and Gray were in

27  financial distress.

28                                                 8

61.   59. In the face of that unmistakable signal, no reasonable buyer would enter into a transaction with Epicenter and Gray because of the perceived risk that Epicenter and Gray would default.

62.   60. Similarly, no buyer would pay a market price for the real property collateral (which was worth several times the face amount of the Note), or refinance the debt (with face amounts of $50,713,000 and $2,956,703.66) when the senior note was being advertised on the open market for $30.6 million.

63.   61. It was obvious to prospective purchasers that a price of $30.6 million for the Note and deed of trust could, upon default, translate to a price of $7.28/square foot for the real estate – 75-85% less than the land was actually worth at that time.

64.   62. Upon information and belief, Defendants additionally authorized HFF to widely disseminate the Note. Consequently, prospective buyers and lenders knew the interest rate Epicenter and Gray were paying. With knowledge of that rate, prospective buyers no longer wished to deal with Epicenter and Gray as those buyers thought Epicenter and Gray were at imminent risk of default, at which time buyers could purchase the land for far less than its market value. Additionally, lenders who had previously been negotiating low double-digit rates suddenly demanded exponentially more.

65.   63. Consequently, Defendants' marketing efforts, including the email blast, prevented Epicenter and Gray from entering into a transaction through which they could have refinanced or extinguished the Note.

66.   64. Prior to HFF's email blast, the Arizona real estate market had begun to show signs of recovery.

67.   65. The HFF marketing immediately caused the Estates' Property and Epicenter and Gray themselves to be viewed as distressed.

68.   66. HFF, at Defendants' direction and with their consent, included the maturity date of the Note in its email blast.

9

1    69.   67. As a result, the market became aware of the Note's December 31, 2015

2 maturity date.  The market was unaware of such information prior to the HFF marketing and

3 its highly public "email blasts."  Epicenter's and Gray's ability to protect their interests by

4 selling a portion of the Estates' Property to satisfy or refinance the Ganymede Note was

5 destroyed virtually overnight.

6    70.   68. On January 14, 2016, a Notice of Trustee's Sale and Notification of

7 Disposition of Personal Property was recorded with the Maricopa County Recorder (2016-

8 0026295) regarding approximately 98 acres of vacant property located west of 56th Street and

9 north of the Loop 101 in Phoenix, Arizona (Tax parcel no. 212-32-100G) and the balance of

10 the Estates' Property.  Epicenter and Gray would have lost the Estates' Property through that

11 sale.

12    **F.**   **Defendants Sell the Claims to CPF.**

13    71.   69. CPF Vaseo Associates, LLC ("CPF") and Defendants entered into a Sale and

14 Assignment Agreement, dated March 23, 2016 (hereafter, the "Sale Agreement").

15    72.   70. Under that Sale Agreement, CPF contracted to purchase the claims of

16 Defendants, who had by then acquired STB's claim, for a very substantial discount.

17    73.   71. On March 30, 2016, after signing the Sale Agreement, CPF was so pleased

18 with the purchase terms that Mr. Robert Flaxman (on behalf of CPF) contacted a possible

19 investor by email stating that, "I have a juicy new deal.  Deep distress and big upside.  When

20 can we connect?"

21    74.   72. On May 13, 2016, counsel for CPF sent correspondence to counsel for

22 Epicenter and Gray notifying Epicenter and Gray that the claimed payoff amount as of May

23 16, 2016 for the Note was a total of $54,853,149.17, plus interest accruing at $52,440.74 per

24 day thereafter.  The same correspondence notified Epicenter and Gray that the claimed payoff

25 amount for the STB Note as of May 16, 2016 was $3,674,319.86, plus interest accruing at

26 $610.76 per day thereafter.

27                              COUNT I

28                                 10

CORE/3506557.0002/129366490.614235301L1

### Declaratory Relief

75. 73. Plaintiff incorporates the foregoing allegations as though fully set forth herein.

76. 74. Upon information and belief, Ganymede was inadequately capitalized for its business.

77. 75. At all times relevant to this litigation, Ganymede failed to maintain corporate formalities.

78. 76. At all times relevant to this litigation, Burford continuously demonstrated a complete and utter lack of adherence to the separate legal personalities of itself and Ganymede by making all high-level decisions on Ganymede's behalf in its dealings with Epicenter and Gray.

79. 77. Further, upon information and belief, Burford and Ganymede failed to honor Ganymede's corporate form.

80. 78. Burford exercised substantially total control over the management and activities of Ganymede during Ganymede's entire existence as a corporate legal entity. Ganymede had no separate mind, will, or existence of its own, but instead its sole purpose was to serve as a business conduit for Burford during its dealings with Epicenter and Gray.

81. 79. During the dealings with Epicenter and Gray in which Ganymede was the named party to the agreements, Burford representatives completely disregarded Ganymede's separate legal personality by directly communicating with Epicenter and Gray on Ganymede's behalf, approving Ganymede's transactions through Burford's own board, and referring to Burford as Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

82. 80. For example, in discussions about the necessity of a "pre-negotiation letter" and the terms therein, Epicenter and Gray negotiated and communicated exclusively with Burford.

83. 81. In the discussions addressing the terms of the pre-negotiation letter, Burford informed Epicenter and Gray that "[w]e are not asking you to give up rights you now have (we

11

don't see how you could possibly have a claim against us). We simply want you to acknowledge that the debt is coming due and you don't have claims against us – a standard request for a creditor whose debtor wants to negotiate a forbearance." The person writing the word "we" worked for Burford and was using it to refer to Burford, not Ganymede.

84.    82. In discussions addressing Epicenter's and Gray's closing of an outlet mall sale to pay down the Note, Burford mentioned the Burford board's ability to vary the terms of the deal as well as the Burford board's desire to gain extra returns on the deal if the closing were delayed beyond September 2014.

85.    83. In the discussions addressing Epicenter's and Gray's paydown of the Note, Burford informed Epicenter and Gray that Burford and STB had reached an agreement that permitted Burford, not Ganymede, to accept an offer by a particular date and have Epicenter and Gray roll the STB Note into a new note for the same value with new security.

86.    84. In the discussions addressing Epicenter and Gray's paydown of the Note, Burford informed Epicenter and Gray that Burford's board had given their final approval and the deal was ready to close.

87.    85. In later negotiations relating to Ganymede's Note, on which Ganymede was the payee, Burford told Epicenter and Gray that their "ideal source of financing would be an entity with a lower cost of capital, and lower return expectations than Burford."

88.    86. Burford intended to utilize Ganymede as nothing more than a shell company, and made these intentions known by approving Ganymede's purported transactions with its own board as well as referring to itself as Epicenter's and Gray's creditor despite Ganymede's status as the secured party of record.

89.    87. Observance of the separate legal personalities of Burford and Ganymede would sanction fraud and promote injustice against Epicenter and Gray.

90.    88. Epicenter and Gray are entitled to pierce the corporate veil between Burford and Ganymede, and hold Burford liable for all damages suffered by Epicenter and Gray as a result of its conduct.

12

91.   89.  Epicenter and Gray are entitled to a declaration that Ganymede's corporate veil may be disregarded as a mere alter ego of Burford.

92.   90.  Disregarding Ganymede's separate legal status is necessary to prevent injustice.

93.   91.  There is an actual and justiciable controversy between Epicenter and Gray and Defendants concerning whether Burford owes Epicenter and Gray a contractual duty of good faith and fair dealing under the Note.

94.   92.  Epicenter and Gray are entitled to a declaration that Burford owed Epicenter and Gray a contractual duty of good faith and fair dealing pursuant to the Note.

95.   93.  This declaratory judgment action arises out of contract, so Epicenter and Gray are entitled to attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## COUNT II

### Breach of the Duty of Good Faith and Fair Dealing

96.   94.  Plaintiff incorporates the foregoing allegations as though fully set forth herein.

97.   95.  The duty to comply with the implied covenant of good faith and fair dealing is implied in all contracts, including the Note.

98.   96.  Defendants breached their duty of good faith and fair dealing by taking actions inconsistent with the agreed upon purpose and reasonable expectations of the parties when entering into the Note.

99.   97.  Under the Note, Epicenter and Gray were to have the benefit of the originally advanced funds, with no obligation to repay until the agreed-upon maturity date.

100.   98.  Defendants established a routine practice of granting extensions to the maturity date during the parties' prior course of dealing.

101.   99.  Then, without notice to Epicenter and Gray, Defendants decided that they did not want to wait even for the maturity date to be repaid.

13

102. ~~100.~~ Defendants decided they would instead prefer to get paid sooner, and therefore took steps to suggest to participants in the Arizona real estate market that the debt was distressed. Defendants were willing to accept less than face value for the Note because Defendants only had a net investment of approximately $1.43 million in the Note, and consequently would reap an enormous profit even if they sold their interest for less than the $50 million face amount.

103. ~~101.~~ Defendants knew that doing this would prevent Epicenter and Gray from engaging in an orderly liquidation of a portion of the Estates' Property or the refinancing necessary to satisfy the Note.

104. ~~102.~~ Defendants knew that Epicenter and Gray would instead become likely to lose all of the Estates' Property.

105. ~~103.~~ Defendants breached the duty of good faith and fair dealing by interfering with Epicenter's and Gray's ability and right to repay the Note when due.

106. ~~104.~~ As a direct and proximate cause of Defendants' conduct, Epicenter and Gray were damaged in an amount to be proven at trial, but in excess of $200 million through the loss of the Estates' Property.

107. ~~105.~~ These damages arose naturally from Defendants' breach of the duty of good faith and fair dealing, were foreseeable, and were reasonably within the contemplation of the parties at the time they entered into the Note.

## COUNT III

### Tortious Interference with Prospective Business Expectancy

108. ~~106.~~ Plaintiff incorporates the foregoing allegations as though fully set forth herein.

109. ~~107.~~ Epicenter and Gray had a valid business expectancy in selling part of the Estates' Property to pay off or refinance the Note.

110. ~~108.~~ Burford was aware that Epicenter and Gray had a valid business expectancy in selling part of the Estates' Property to satisfy or refinance the Note.

14

111. ~~109.~~ Burford knew that Epicenter and Gray were in on-going negotiations with specific buyers to sell part of the Estates' Property to satisfy or refinance the Note.

112. ~~110.~~ While knowing of Epicenter's and Gray's valid business expectancy and on-going negotiations with prospective purchasers, Burford directed HFF to send the email "blast" advertising the Note for sale at a substantial discount.

113. ~~111.~~ Through its publicly broadcasted marketing efforts, including the HFF email blast, Burford intentionally and wrongfully interfered with Epicenter's and Gray's ability to market the Estates' Property, and thereby destroyed Epicenter's and Gray's prospective business expectancy.

114. ~~112.~~ As a direct and proximate result of Burford's tortious interference with Epicenter's and Gray's valid business expectancy, Epicenter and Gray have suffered damages in an amount to be determined at trial, but in excess of $200 million.

## DAMAGES

Wherefore, Plaintiff prays for entry of a judgment granting relief as follows:

A.    For orders declaring the parties' rights in Plaintiff's favor as described above;

B.    For damages in an amount to be proven at trial;

C.    For pre- and post-judgment interest;

D.    Costs and attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01; and

E.    For such other and further relief as the Court determines just and necessary to provide Plaintiffs with a complete remedy under the circumstances.

RESPECTFULLY SUBMITTED this ~~15~~14th day of ~~May~~September, 2018.


STINSON LEONARD STREET LLP

/s/ Stefan M. Palys
Michael C. Manning
Jeffrey J. Goulder
Stefan M. Palys
James Camoriano
1850 N Central Ave., Ste. 2100
Phoenix, AZ 85004
Attorneys for Plaintiff

15

1

2

3  ORIGINAL e-filed via AZTurboCourt
   this ~~15~~14th day of ~~May~~September, 2018:

4  Clerk of the Court

5  Maricopa County Superior Court
   201 West Jefferson
   Phoenix, Arizona  85003

6

7  /s/ Cynthia Fischer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

| Summary report: Litéra® Change-Pro TDC 10.1.0.200 Document comparison done on 9/14/2018 9:11:17 AM ||
|---|---|
| Style name: Default Style ||
| Intelligent Table Comparison: Active ||
| Original DMS: iw://EDMS/CORE/139366490/6 ||
| Modified DMS: iw://EDMS/CORE/142353011/1 ||
| Changes: ||
| Add | 121 |
| Delete | 115 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| Total Changes: | 236 |

# EXHIBIT C

# EXHIBIT C

SO ORDERED.

Dated: August 23, 2018



Madeleine C. Wanslee

Madeleine C. Wanslee, Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ☐ EPICENTER PARTNERS L.L.C. (EIN 20-1285677), | Case No. 2:16-bk-05493-MCW |
| ☐ GRAY MEYER FANNIN L.L.C. (EIN 86-1042085), | (Jointly Administered with: Case No. 2:16-bk-05494-MCW |
| ☐ SONORAN DESERT LAND INVESTORS LLC (EIN 86-1042090), | Case No. 2:16-bk-07659-MCW Case No. 2:16-bk-07660-MCW |
| ☐ EAST OF EPICENTER LLC (EIN 20-4226710), | Case No. 2:16-bk-07661-MCW) |
| ☐ GRAY PHOENIX DESERT RIDGE II, LLC (EIN 46-3117542), | **ORDER GRANTING JOINT MOTION TO APPROVE SETTLEMENT OF CLAIM ON EXPEDITED BASIS** |
| Debtors. | |
| Address: 5515 E. Deer Valley Dr., Phoenix, AZ 85054 | |
| This Filing Applies to: ☒ All Debtors ☐ Specified Debtor(s) | |

Epicenter Partners L.L.C., Gray Meyer Fannin L.L.C., Sonoran Desert Land Investors LLC; East of Epicenter LLC; and Gray Phoenix Desert Ridge II, LLC, debtors in the above-captioned jointly administered bankruptcy cases ("Debtors"), and R.O.I. Properties, LLC ("Liquidating Trustee") acting through Beth Jo Zeitzer, and Gray Phoenix Desert Ridge I, LLC, ("GPDR I"), by and through their respective counsel, filed a *Joint Motion to Approve Settlement of Claim on Expedited Basis* ("Joint Motion")(DE 1234). The Joint Motion sets forth the terms of a proposed compromise between the Liquidating

1  Trustee of the May Liquidating Trust and July Liquidating Trust, and the Debtors and
2  GPDR I (the "Compromise"). CPF Vaseo Associates, LLC, filed its *Answer and Objection*
3  *to Joint Motion to Approve Settlement of Claim on Expedited Basis; And Request for*
4  *Evidentiary Hearing and Opportunity to Conduct Reasonable Discovery* (DE 1241)(the
5  "CPF Objection"). Emerald Equities, LLC filed its *Opposition to Joint Motion to Approve*
6  *Settlement of Claim on Expedited Basis and Motion to Expedite Hearing on Accelerated*
7  *Notice* (DE 1245) ("Emerald Objection"). Counsel for the Debtors served the Court's *Order*
8  *Expediting Hearing on Accelerated Notice* (DE 1237) by email on those making formal
9  appearances. The Joint Motion came before the Court for expedited hearing on accelerated
10  basis on August 20, 2018, at 1:30 p.m., and in addition to argument of counsel, evidence
11  was presented at the hearing.

12       On August 22, 2018, after consideration of the Joint Motion, the CPF Objection, the
13  Emerald Objection, the arguments of counsel and evidence presented at the hearing, and for
14  good cause appearing, the Court entered a signed *Minute Entry Order* at DE 1246, setting
15  forth certain findings and conclusions and granting the Joint Motion, and directing the
16  movants to upload a form of order consistent with the Joint Motion and the Minute Entry
17  Order.

18       WHEREFORE, after consideration of the Joint Motion, the CPF Objection, the
19  Emerald Objection, the argument of counsel and evidence presented at the hearing, and for
20  good cause appearing,

21       THE COURT INCORPORATES all findings and conclusions set forth in the Minute
22  Entry Order;

23       **THE COURT FURTHER FINDS** that the Liquidating Trustee entering into the
24  Compromise set forth in the Joint Motion is an appropriate exercise of the Liquidating
25  Trustee's business judgment, that the Compromise is fair, equitable, and in the best interests
26  of the May and July bankruptcy estates and creditors, that the Compromise is proper under

1  both the Confirmed Plan and under the factors articulated in *In re Woodson*, 839 F.2d 610

2  (9th Cir. 1987), that the Compromise meets the minimum threshold of reasonableness, that

3  time is of the essence in effectuating the Compromise and any right to satisfy claims under

4  Section 8.9 of the Confirmed Plan, and that exigent circumstances warranted the expedited

5  hearing and notice was proper under the circumstances.

6      WHEREFORE,

7      **IT IS ORDERED** as follows:

8      1.    Granting the Joint Motion and approving the Compromise;

9      2.    Overruling the CPF Objection;

10      3.    Overruling the Emerald Objection. The transfer of property under Section 8.9

11  of the Confirmed Plan will be subject to any continuing liens, claims, and interests of

12  Emerald Equities to the same extent they now exist;

13      4.    The Liquidating Trustee is expressly authorized to accept the sum of

14  $1,800,000, as set forth in the Joint Motion, as full and complete satisfaction of any and all

15  claims of the May Liquidating Trust and estates against the July Liquidating Trust and

16  estates including scheduled claims of Epicenter Partners and GPDR I;

17      5.    The Liquidating Trustee is expressly authorized to execute all necessary

18  releases and attendant documents to effectuate the Compromise;

19      6.    The Liquidating Trustee is expressly authorized, in conjunction with the

20  satisfaction of claims pursuant to Section 8.9 of the Confirmed Plan, to execute all necessary

21  documents, transfers, or conveyances to effectuate Section 8.9 of the Confirmed Plan and to

22  effectuate the transfer of all assets of the July Liquidating Trust and the July estates,

23  including all real and personal property and any claims or causes of action held by the July

24  Liquidating Trust or estates, to the July Debtors, Bruce Gray, or their assigns.

25      7.    The Liquidating Trustee is expressly authorized to abandon the Burford

26

1   Claims to the Debtors, Bruce Gray, or their assigns;

2       8.      The Liquidating Trustee is expressly authorized to transfer any membership

3   interest in GPDR I held by the May Debtors to Bruce Gray or assigns pursuant to the

4   Compromise.

5       9.      Waiving, with respect to the Joint Motion and Compromise, the 21-day

6   settlement notice period set forth in Fed R. Bankr. P. 2002(a)(3) and 9019(a);

7       10.     Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy

8   Rule 6006(d), this Order shall not be stayed after the entry hereof, but shall be effective and

9   enforceable immediately upon issuance hereof. Time is of the essence in closing

10  transactions referenced in the Joint Motion; and

11      11.     This Order shall be immediately binding and effective against all creditors,

12  other parties-in interest in the Bankruptcy Cases, the Liquidating Trusts, and the Bankruptcy

13  Estates.

14                      **DATED AND SIGNED ABOVE.**

15

16  On August 23, 2018, counsel for the
17  Liquidating Trustee reviewed and
    approved this order as directed by
18  the Minute Entry.

19  MESCH CLARK ROTHSCHILD

20

21  By <u>David J. Hindman, # 24704</u>
22      David J. Hindman

23  Attorneys for Debtor

24

25
26  25G7060

# EXHIBIT D

# EXHIBIT D

## ASSIGNMENT OF CLAIMS

This Assignment of Claims ("**Assignment**") is executed as of September 10, 2018 ("**Assignment Date**") by and between: (i) Epicenter Partners L.L.C., an Arizona limited liability company, and Gray Meyer Fannin L.L.C., an Arizona limited liability company (together, the "**Assignor**"); and (ii) Epicenter Loss Recovery LLC, an Arizona limited liability company ("**Assignee**").   Assignor and Assignee are collectively the "**Parties**".

## BACKGROUND

A.      In connection with the Settlement Order ("**Order**") issued in the Chapter 11 Proceedings in Case No. 2:16-bk-05493-MCW in the United States Bankruptcy Court for the District of Arizona, certain claims, as more particularly set forth in the First Amended Complaint filed in the Superior Court of Arizona, Maricopa County, Case No. CV2018-007464 (a copy of which is attached to this Assignment as Exhibit "A") were abandoned to the Assignor.  The abandoned claims that are described in the foregoing sentence are collectively the "**Burford Claims**".

B.      Assignor desires to assign its entire right, title, and interest in and to the Burford Claims (the "**Assigned Interests**") to Assignee.

## AGREEMENTS

For valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows.

1.      Assignor assigns the Assigned Interests to Assignee, and Assignee assumes the Assigned Interests from Assignor.

2.      All proceeds of any kind arising from or in any way related to the Assigned Interests ("**Proceeds**") shall be retained solely by the Assignee, and Assignor will make no claim, under any theory, to any Proceeds.

3.      This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

4.      No waiver by either party of any breach of any term or condition of this Assignment shall operate as a waiver of any other breach of such term or condition or of any other term or condition.  No failure to enforce such provision shall operate as a waiver of such provision or of any other provision hereof, or constitute or be deemed a waiver or release of any other party for anything arising out of, connected with, or based upon this Assignment.

5.      This Assignment shall be binding upon and inure to the benefit of the Parties and their respective transferees, successors, and assigns.

6.      This Assignment shall be governed by and construed in accordance with the laws of the State of Arizona.  In the event of any dispute between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such dispute, including, without limitation, reasonable attorneys' fees and costs.

7.  This Assignment supersedes all prior agreements and constitutes the entire agreement with respect to the Assigned Interests, and it may not be altered or modified without the written consent of the Parties.

Executed as of the Assignment Date

**Assignor**

Epicenter Partners L.L.C., an Arizona limited liability company

By:      GDG Enterprises L.L.C., an Arizona
         limited liability company, its Manager

         By: _____
           Its: Manager

Gray Meyer Fannin L.L.C., an Arizona
limited liability company

By: _____
  Its: Manager

**Assignee**

Epicenter Loss Recovery LLC, an Arizona
limited liability company

By: _____
  Its: Sole Member

# EXHIBIT E

# EXHIBIT E

Michael C. Manning (016255)
Jeffrey Goulder (010258)
Stefan M. Palys (024752)
James D. Camoriano (034181)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: michael.manning@stinson.com
       jeffrey.goulder@sinson.com
       stefan.palys@stinson.com
       james.camoriano@stinson.com
*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

R.O.I. PROPERTIES, INC. as
Liquidating Trustee of the estates of
EPICENTER PARTNERS, L.L.C. and
GRAY MEYER FANNIN, L.L.C.,

                     Plaintiff,

vs.

BURFORD CAPITAL LTD., and
GANYMEDE INVESTMENTS LTD.,

                     Defendants.

No. CV2018-007464

**DECLARATION IN SUPPORT OF
EXTENSION OF TIME FOR
SERVICE ON DEFENDANTS**

(Assigned to Hon. Timothy Thomason)

I, James Camoriano, declare as follows:

1.      I am an attorney at Stinson Leonard Street LLP ("SLS") and am one of the lawyers for Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. (hereinafter "Epicenter/GMF") in civil case *R.O.I. Properties, Inc. as Liquidating Trustee of the estates of Epicenter Partners, L.L.C. and Gray Meyer Fannin, L.L.C. v. Burford Capital Ltd. and Ganymede Investments Ltd.*, Superior Court, Maricopa County, No.: CV2018-007464.

2.      Perkins Coie represented Defendant Ganymede Investments Limited (hereinafter "Ganymede") with respect to the Restated and Amended Forward Purchase

1  Agreement dated January 3, 2011 (hereinafter the "Forward Purchase Agreement"). On

2  October 5, 2016, Counsel for Ganymede contacted SLS regarding SLS's *Motion to*

3  *Unseal Adversary Proceeding No. 2:16-ap-00334-MCW* previously filed on behalf of

4  Epicenter/GMF. Among other things, counsel for Ganymede discussed the resolution of

5  any disputes between Epicenter/Gray and Ganymede arising out of the Forward

6  Purchase Agreement.

7       3.     The communication between counsel for Defendants and SLS is based on

8  my personal knowledge, including my review of such correspondence as described

9  herein.

10      4.     SLS intends to retain the services of Process Service Network, LLC

11  (hereinafter "Process Service Network") for the purpose of effecting service of process

12  on Burford Capital Ltd. and Ganymede Investments Ltd. (hereinafter "Defendants"),

13  two companies organized under the laws of Guernsey.

14      5.     Process Service Network has informed me about its methods and

15  timeframes for service of process under the Hague Convention on the Service Abroad of

16  Judicial and Extra-Judicial Documents in Civil or Commercial Matters (hereinafter the

17  "Hague Service Convention").

18      6.     Process Service Network informed me that its timeframe for

19  accomplishing service of process under the procedures of the Hague Service

20  Convention generally takes up to four months. *Accord*

21  http://www.processnet1.com/guernsey.htm (Process Service Network's website, so

22  stating).

23

24      7.     Process Service Network informed me that its method of service by online

25  publication entails publishing the Complaint, Summons, Order, any notices, and all

26  court-issued documents continuously on the online legal notice publication Global

27  Legal Notices (which may be located at http://www.globallegalnotices.com/)   for a

28                                                    2

CORE/3506557.0002/142374002.1

period of three consecutive months.

8.      Process Service Network representative also confirmed that online publication in the Global Legal Notices publication is a commonly requested method of service by its clients, and that it frequently receives court approval to utilize this method.

9.      Pursuant to Arizona Rule of Civil Procedure 80(c), I verify under the penalty of perjury that the foregoing is true and correct.

Executed this 14th day of September, 2018.


By:    /s/James Camoriano
       James Camoriano

3

CORE/3506557.0002/142374002.1

# EXHIBIT F

# EXHIBIT F

Palys, Stefan M.

| | |
|---|---|
| **From:** | Swindle, Shane (Perkins Coie) <SSwindle@perkinscoie.com> |
| **Sent:** | Wednesday, September 5, 2018 9:08 PM |
| **To:** | Palys, Stefan M. |
| **Subject:** | Re: Complaint re: Burford/Ganymede |

Stefan,

I am following up on my email from last week. While we are still not currently authorized to accept service, I'm writing to let you know that we are looking into the question with our clients and may have additional information for you within the next few weeks.

Thank you,

**Shane Swindle | Perkins Coie LLP**
**PARTNER**
2901 North Central Avenue Suite 2000
Phoenix, AZ 85012-2788
D. +1.602.351.8384
M. +1.602.791.6325
E. SSwindle@perkinscoie.com

**From:** "Swindle, Shane (PHX)" <SSwindle@perkinscoie.com>
**Date:** Wednesday, August 29, 2018 at 11:58 AM
**To:** "stefan.palys@stinson.com" <stefan.palys@stinson.com>
**Cc:** Bradley Cosman <BCosman@perkinscoie.com>
**Subject:** Complaint re: Burford/Ganymede

Stefan,

I am responding to your August 27 email to Brad Cosman regarding the above-referenced matter. Perkins Coie is not authorized to accept service of the complaint. Thank you.

**Shane Swindle | Perkins Coie LLP**
**PARTNER**
2901 North Central Avenue Suite 2000
Phoenix, AZ 85012-2788
D. +1.602.351.8384
M. +1.602.791.6325
E. SSwindle@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

1

# Exhibit A-12

Granted as Submitted
***See eSignature page***

Chris DeRose, Clerk of Court
*** Electronically Filed ***
N. Johnson, Deputy
9/18/2018 8:00:00 AM
Filing ID 9711462

Michael C. Manning (#016255)
Jeffrey Goulder (#010258)
Stefan Palys (#024752)
James Camoriano (#034181)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
michael.manning@stinson.com
jeffrey.goulder@stinson.com
stefan.palys@stinson.com
james.camoriano@stinson.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| EPICENTER PARTNERS LLC and GRAY MEYER FANNIN LLC, by and through ROI PROPERTIES, LLC, LIQUIDATING TRUSTEE OF THE MAY LIQUIDATING TRUST,<br><br>       Plaintiffs,<br><br>v.<br><br>BURFORD CAPITAL LTD., and GANYMEDE INVESTMENTS LTD.<br><br>       Defendants. | No. CV2018-007464<br><br>**ORDER** |

Before the Court is Plaintiffs' Ex Parte *Motion for (1) Leave to Amend the Complaint to Substitute Real Party in Interest, (2) an Extension of Time to Accomplish Service of Process on Defendants, and (3) An Order Permitting Service by Alternative Means* (the "Motion"). For the reasons stated in the Motion, and good cause appearing,

**IT IS HEREBY ORDERED** granting the Motion.

**IT IS FURTHER ORDERED** that the Second Amended Complaint is deemed filed as of the date on which this order is filed.

**IT IS FURTHER ORDERED** extending the time for service of process upon

CORE/3506557.0002/142382672.1

Defendants Burford Capital Limited and Ganymede Investments Limited from September 14, 2018 through, and including, March 14, 2019.

**IT IS FURTHER ORDERED** granting Plaintiff leave to accomplish service of process upon Defendant Ganymede Investments Limited by publication continuously for three consecutive months in the online legal notice publication, Global Legal Notices; and Plaintiff may accomplish service by emailing process to counsel for Defendants Burford Capital Limited and Ganymede Investments Limited, by sending it via email to Shane Swindle (SSSwindle@perkinscoie.com) and Bradley Cosman (BCosman@perkinscoie.com) at Perkins Coie LLP.

DATED this _____ day of _____, 2018.

Hon. Timothy Thomason
Maricopa County Superior Court Judge

2

eSignature Page 1 of 1

Filing ID: 9711462   Case Number: CV2018-007464
Original Filing ID: 9706585

---

Granted as Submitted



/S/ Timothy Thomason Date: 9/17/2018

Judicial Officer of Superior Court

ENDORSEMENT PAGE

CASE NUMBER: CV2018-007464                    SIGNATURE DATE: 9/17/2018

E-FILING ID #: 9711462                        FILED DATE: 9/18/2018 8:00:00 AM

MICHAEL C MANNING

BURFORD CAPITAL LTD
NO ADDRESS ON RECORD

GANYMEDE INVESTMENTS LTD
NO ADDRESS ON RECORD

# Exhibit B

# Arizona Corporation Commission Corporations Division Website Entity Detail. http://ecorp.azcc.gov/

## Entity Details

| | | | |
|---|---|---|---|
| Entity Name: | EPICENTER LOSS RECOVERY LLC | Entity ID: | 1894641 |
| Entity Type: | Domestic LLC | Entity Status: | **Active** |
| Formation Date: | 8/30/2018 | Reason for Status: | In Good Standing |
| Approval Date: | 9/20/2018 | Status Date: | |
| Original Incorporation Date: | 8/30/2018 | Life Period: | Perpetual |
| Business Type: | Any legal purpose | Last Annual Report Filed: | |
| Domicile State: | Arizona | Annual Report Due Date: | |
| Years Due: | | | |
| Original Publish Date: | 9/20/2018 | | |

## Statutory Agent Information

| | | | |
|---|---|---|---|
| Name: | BRIAN J JORDAN | Appointed Status: | Active 8/30/2018 |
| Address: | KUTAK ROCK LLP 8601 N SCOTTSDALE RD STE 300 , SCOTTSDALE, AZ 85253, USA | Agent Last Updated: | 9/20/2018 |
| E-mail: | brian.jordan@kutakrock.com | Mailing Address: | KUTAK ROCK LLP 8601 N SCOTTSDALE RD STE 300 , SCOTTSDALE, AZ 85253, USA |
| County: | Maricopa | | |

## Principal Information

| Title | Name | Address | Date of Taking Office | Last Updated |
|---|---|---|---|---|
| Member | BRUCE GRAY | 5515 E. DEER VALLEY DRIVE, PHOENIX, AZ, 85054, Maricopa County, USA | | 9/20/2018 |
| Organizer | BRIAN J JORDAN | KUTAK ROCK LLP 8601 N SCOTTSDALE RD STE 300, SCOTTSDALE, AZ, 85253, Maricopa County, USA | | 9/20/2018 |

# Arizona Corporation Commission Corporations Division
# Website Entity Detail. http://ecorp.azcc.gov/

**Entity Known Place of Business**

| Address: | 5515 E. DEER VALLEY DRIVE, PHOENIX, AZ, 85054, USA | County: | Maricopa | Last Updated: | 9/20/2018 |
|---|---|---|---|---|---|

**Entity Principal Office Address**

| Address: | County: | Last Updated: |
|---|---|---|

# Exhibit C

# ARTICLES OF ORGANIZATION

## OF LIMITED LIABILITY COMPANY

### ENTITY INFORMATION

**ENTITY NAME:**                     Epicenter Loss Recovery LLC

**ENTITY ID:**                       1894641
**ENTITY TYPE:**                     Domestic LLC
**EFFECTIVE DATE:**                  08/30/2018
**CHARACTER OF BUSINESS:**           Any legal purpose
**MANAGEMENT STRUCTURE:**            Member-Managed
**PERIOD OF DURATION:**              Perpetual
**PROFESSIONAL SERVICES:**

### STATUTORY AGENT INFORMATION

**STATUTORY AGENT NAME:**    BRIAN J JORDAN

**PHYSICAL ADDRESS:**        KUTAK ROCK LLP 8601 N SCOTTSDALE RD STE 300 ,
                             SCOTTSDALE, AZ 85253
**MAILING ADDRESS:**         KUTAK ROCK LLP 8601 N SCOTTSDALE RD STE 300 ,
                             SCOTTSDALE, AZ 85253

### KNOWN PLACE OF BUSINESS

Att: BRUCE GRAY, 5515 E. DEER VALLEY DRIVE, PHOENIX, AZ 85054

### PRINCIPALS

Member: BRUCE GRAY - 5515 E. DEER VALLEY DRIVE, PHOENIX, AZ 85054 - - Date of Taking Office:

### ORGANIZERS

BRIAN J JORDAN

### SIGNATURES

Organizer: BRIAN J JORDAN - 08/30/2018

## ARTICLES OF ORGANIZATION
## OF EPICENTER LOSS RECOVERY LLC

Pursuant to Arizona Revised Statutes §§ 29-632, the undersigned agrees to form an Arizona limited liability company and states as follows:

1.     **Name.**  The name of this limited liability company is Epicenter Loss Recovery LLC.

2.     **Known Place of Business and Statutory Agent.**  The address of the known place of business of this limited liability company and the name and street address of the statutory agent for service of process are:

Known Place of Business:     5515 E. Deer Valley Drive
Phoenix, AZ 85054

Statutory Agent:     Brian J. Jordan
Kutak Rock LLP
Suite 300
8601 North Scottsdale Road
Scottsdale, AZ 85253-2742

3.     **Perpetual Existence.**     The limited liability company will have perpetual existence.

4.     **Member.**  Management of this limited liability company is reserved to its Member. The name and mailing address of each person who is a Member of this limited liability company at the time of its formation are:

Bruce Gray
5515 E. Deer Valley Drive
Phoenix, AZ 85054

The undersigned has executed these Articles of Organization as of August 30, 2018.

Brian J. Jordan, Organizer

## CONSENT OF STATUTORY AGENT

The undersigned, having been designated to act as statutory agent for Epicenter Loss Recovery LLC, hereby consents to act in that capacity until removed or until my resignation is submitted in accordance with the Arizona Revised Statutes.

Brian J. Jordan