1    **WO**

2                                    **NOT FOR PUBLICATION**

3

4

5

6

7                        **IN THE UNITED STATES DISTRICT COURT**

8                            **FOR THE DISTRICT OF ARIZONA**

9

10   ROI Properties Incorporated, et al.,            No. CV-18-03300-PHX-DJH

11                    Plaintiffs,                     **ORDER**

12   v.

13   Burford Capital Limited, et al.,

14                    Defendants.

15

16          This matter is before the Court on Defendants' Rule 12(b)(1) Motion to Compel

17   Arbitration Pursuant to the Federal Arbitration Act, and to Dismiss or Stay this Litigation

18   (Doc. 5).  Plaintiff[1] filed a Response (Doc. 29) and Defendants filed a Reply (Doc. 33).

19   The parties have requested oral argument, but the Court finds that the briefing is adequate

20   and oral argument would not aid the Court; therefore, the Court will deny the parties'

21   request for oral argument.  *Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197,

22   1200 (9th Cir. 1999); *Lake at Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933

23   _____
     [1] Epicenter Partners LLC ("Epicenter") and Gary, Meyer, Fannin LLC ("Gary") each filed
24   for bankruptcy on May 16, 2016.  (Doc. 1-2 at 72).  On May 1, 2018, pursuant to an Order
     in the bankruptcy cases, R.O.I. Properties, LLC ("ROI"), as Liquidating Trustee of the May
25   Liquidating Trust, became authorized to pursue claims on behalf of Epicenter and Gary.
     (*Id.*)  On August 22, 2018, the Bankruptcy Court approved a settlement, and under the
26   terms of the settlement ROI transferred the claims it brought on behalf of Epicenter and
     Gary to Epicenter and Gary.  (*Id.*)  On August 31, 2018, Epicenter and Gary assigned this
27   claim to Epicenter Loss Recovery, LLC ("ELR").  (*Id.*)  On September 18, 2018, Plaintiffs
     filed a Second Amended Complaint ("SAC") which substituted ELR as the only Plaintiff
28   in this litigation.  (Doc. 1-3 at 71).  Therefore, the only Plaintiff remaining in this litigation
     is ELR.

1   F.2d 724, 729 (9th Cir. 1991).

2   **I.     BACKGROUND**

3          This lawsuit arises out of a series of contracts—litigation financing agreements

4   called Forward Purchase Agreements ("FPA")—between Defendant Ganymede

5   Investments Limited ("Ganymede") and Epicenter Partners LLC ("Epicenter") and Gary,

6   Meyer, Fannin LLC ("Gary").  (Doc. 5 at 2).  Ganymede, a Guernsey[2] corporation with its

7   principal place of business in St. Peter Port, Guernsey, is in the business of litigation

8   financing.  (*Id.*)  Defendant Burford Capital Ltd. ("Burford"), a holding company and the

9   ultimate parent of Ganymede, is also a Guernsey corporation.

10         In 2009, Epicenter and Gary were involved in real estate litigation in Arizona and

11  needed additional financing to continue the litigation.  (*Id.*)  Thus, on December 22, 2009,

12  Epicenter and Gary entered into a FPA with Ganymede ("2009 FPA") to secure the

13  additional financing needed to continue litigating their real estate case.  (*Id.*)  The 2009

14  FPA contained an arbitration provision that required the parties to arbitrate in London,

15  England: "[a]ny dispute, controversy or claim arising out of or in connection with this

16  Agreement, including any question regarding its formation, existence, validity,

17  interpretation, performance, breach or termination shall (to the exclusion of any other

18  forum) be referred to and finally resolved by arbitration applying the Arbitration Rules of

19  the [London Court of International Arbitration]."   (Doc. 1-6 at 18).   The parties

20  subsequently signed several more FPAs that supplemented and amended the prior FPAs,[3]

21  all of which contained identical arbitration provisions.  (Doc. 1-8 at 2).  The 2013 FPA is

22

23  [2] Guernsey is one of the Channel Islands in the English Channel near the French coast, and
    is a self-governing British Crown dependency. *The World Factbook: Guernsey*, U.S.
24  CENTRAL INTELLIGENCE AGENCY, https://www.cia.gov/library/publications/the-world-
    factbook/geos/gk.html (last updated January 9, 2019).  Guernsey is a major international
25  financial center; in fact, more companies listed on the London Stock Exchange are
    incorporated in Guernsey than any jurisdiction other than England itself.  (Doc. 5 at 2).

26  [3] On August 3, 2010, Epicenter and Gary entered into the Restated and Amended FPA
    ("2010 FPA") with Ganymede that amended the 2009 FPA.  (Doc. 1-6 at 52).  On January
27  3, 2011, Epicenter and Gary entered into a second Restated and Amended FPA ("2011
    FPA") with Ganymede that amended the 2010 FPA.  (Doc. 1-7 at 17).  On April 22, 2013,
28  the parties signed the Second Supplemental Agreement and Amendment Relating to
    Restated and Amended Forward Purchase Agreement ("2013 FPA").  (Doc. 1-8 at 2).

the operative FPA.

Epicenter and Gary successfully litigated the real estate case, and on October 19, 2010, Epicenter and Gary obtained a judgment of $110,658,800.00 plus interest.  (Doc. 1-3 at 75).  On May 31, 2012, Epicenter and Gary negotiated a settlement with respect to the real estate litigation judgment and received a settlement of substantial real estate holdings, but no cash.  (Doc. 1-3 at 75-76).  Subsequently, on April 22, 2013, Epicenter and Gary entered into the 2013 FPA with Ganymede, but also entered into a Subordination and Intercreditor Agreement ("Intercreditor Agreement"), which included a broad arbitration provision.  (Doc. 1-8 at 43).  Also on April 22, 2013, the parties executed a Promissory Note ("Note") and an accompanying Deed of Trust, both of which did not contain an arbitration provisions.  (*Id.* at 69).   However, the Note specified that "the rights and obligations . . . are subject to" the Intercreditor Agreement and that "[i]n the event of any conflict between [the Note] and the Intercreditor Agreement, the Intercreditor Agreement shall control." (*Id.* at 69).

Plaintiff[4] initially filed this suit in Maricopa County Superior Court and Defendants subsequently removed it.  (Doc. 5 at 11).  Plaintiff alleges three causes of action.  In Plaintiff's first cause of action, Plaintiff requests a declaration that "Ganymede's corporate veil may be disregarded" as Ganymede is "a mere alter ego of Burford." (Doc. 1-3 at 82). Plaintiff's second cause of action is a breach of the covenant of good faith implied into the Note against both Ganymede and Burford.  (*Id.* at 83-84).  Plaintiff's third cause of action names only Burford and alleges tortious interference with a prospective business expectancy, which is based on Ganymede exercising its rights to sell the Note.  (*Id.* at 84-85).

## II.    LEGAL STANDARDS

A motion to dismiss pursuant to Rule 12(b)(1) challenges the plaintiff's assertion that the court has subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *Doe v. Schachter*,

---

[4] As previously discussed Epicenter and Gray, signatories to the FPAs and Intercreditor Agreement, assigned their claims to ELR on September 10, 2018, thus ELR is the only Plaintiff remaining in this litigation.

1    804 F. Supp. 53, 56 (N.D. Cal. 1992).  A Rule 12(b)(1) motion to dismiss for lack of subject

2    matter jurisdiction "is a procedurally sufficient mechanism to enforce [an] [a]rbitration

3    [p]rovision." *Cancer Center Assocs. for Research and Excellence, Inc. v. Philadelphia Ins.*

4    *Cos.*, 2015 WL 1766938, at *3 (E.D. Cal. April 17, 2015) (citing *Filimex, L.L.C. v. Novoa*

5    *Invs., L.L.C.,* 2006 WL 2091661, at *2 (D. Ariz. July 17, 2006).

6        "With limited exceptions, the Federal Arbitration Act (FAA) governs the

7    enforceability of arbitration agreements in contracts involving interstate commerce."

8    *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (citing 9 U.S.C. §§ 1,

9    *et seq*.).   "[T]he party seeking to compel arbitration, has the burden of proving the

10   existence of an agreement to arbitrate by a preponderance of the evidence."  *Knutson v.*

11   *Sirius XM Radio Inc.*, 771 F.3d 559, 564 (9th Cir. 2014).  Although a contract may contain

12   a choice-of-law provision that governs the contract's construction, "[t]he scope of an

13   arbitration agreement is governed by federal substantive law."  *Tracer Research Corp. v.*

14   *Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994).  "[A]s a matter of federal law,

15   any doubts concerning the scope of arbitrable issues should be resolved in favor of

16   arbitration, whether the problem at hand is the construction of the contract language itself

17   or an allegation of waiver, delay, or a like defense to arbitrability."  *Chiron Corp. v. Ortho*

18   *Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (quoting *Moses H. Cone Mem'l*

19   *Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

20       While the scope of the arbitration provision is determined by applying federal law,

21   whether there is a valid agreement to arbitrate is determined "by applying general state-

22   law principles of contract interpretation, while giving due regard to the federal policy in

23   favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of

24   arbitration."  *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

25   Agreements to arbitrate may be "invalidated by 'generally applicable contract defenses,

26   such as fraud, duress, or unconscionability,' but not by defenses that apply only to

27   arbitration or that derive their meaning from the fact that an agreement to arbitrate is at

28   issue."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's*

*Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Absent a valid contract defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "The FAA reflects both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Kramer*, 705 F.3d at 1126 (internal citations and quotations omitted). "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130. "If the court finds that an arbitration clause is valid and enforceable, the court should stay or dismiss the action to allow the arbitration to proceed." *Kam–Ko Bio–Pharm Trading Co. Ltd–Australasia v. Mayne Pharma*, 560 F.3d 935, 940 (9th Cir. 2009). Absent unmistakably clear language to the contrary, arbitration should be ordered unless it can be said that the arbitration provision is not susceptible of an interpretation that covers the asserted dispute. *Moses*, 460 U.S. at 24–25.

## III.   DISCUSSION

### A.   Plaintiff's Claims Against Ganymede[5]

Here, the parties do not dispute that the FPAs and the Intercreditor Agreement contain valid arbitration provisions; the only issue is whether Plaintiff's claims at issue fall within the scope of those arbitration provisions. Plaintiff argues that the Note is entirely separate and distinct from the FPAs and the Intercreditor Agreement. (Doc. 29 at 4). Ganymede avers that the Note incorporates by reference the Intercreditor Agreement, thus making all claims relating to the Note subject to the Intercreditor Agreement's arbitration provision. (Doc. 5 at 15).

The issue of whether the Note incorporates by reference the Intercreditor Agreement's arbitration provision is an issue of contract formation; therefore, the Court

---

[5] As Burford is not a signatory to the FPAs, the Note, or the Intercreditor Agreement, the Court will address the arbitrability of the claims against each defendant separately. *See Kingsley Capital Mgmt., LLC v. Sly*, 820 F. Supp. 2d 1011, 1018 (D. Ariz. 2011).

will apply Arizona state law to determine whether the Note does in fact incorporate the Intercreditor Agreement. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) ("When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation.").  "Under Arizona law, a contracting party agrees to terms and conditions in an extrinsic document if the agreement being executed clearly and unequivocally refers to the extrinsic document, the party consents to the incorporation by reference, and the terms of the incorporated document are 'known or easily available to the contracting parties.'" *Edwards v. Nutrition*, 2018 WL 637382, at *3 (D. Ariz. Jan. 31, 2018) (quoting *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983)).  It is not necessary for a contract to specifically state that another writing is incorporated by reference; however, "the context in which the reference is made must make clear that the writing is part of the contract." *Prudential Ins. Co. of Am.*, 681 P.2d at 420.

Here, the Note was executed simultaneously with the 2013 FPA and the Intercreditor Agreement.  Furthermore, the Note provides that its "rights and obligations . . . are subject to" the Intercreditor Agreement and that "[i]n the event of any conflict between [the Note] and the Intercreditor Agreement, the Intercreditor Agreement shall control."  (Doc. 1-8 at 69).  Arizona courts have previously held that a "subject to" reference is sufficient to incorporate another writing by reference. *Prudential Ins. Co. of Am.*, 681 P.2d at 420 (holding "that the 'subject to' reference to the plan was sufficient to incorporate it and that the plan did not have to be set out in full in the contract.").  Thus, because the Note specifically provides that it is "subject to" the Intercreditor Agreement, the Court finds that the Note incorporates the Intercreditor Agreement, which includes its arbitration provision. *Weatherguard Roofing Co., Inc. v. D.R. Ward Const. Co., Inc.*, 152 P.3d 1227, 1230 (Ariz. Ct. App. 2007).

Next, before addressing whether Plaintiff's claims against Ganymede fall within the scope of the Intercreditor Agreement's arbitration provision, the Court must first address *who*—the arbitrator or the Court—should decide the gateway question of whether

1   Plaintiff's claims are subject to arbitration.[6]  *Oracle Am., Inc. v. Myriad Group A.G.*, 724

2   F.3d 1069, 1073 (9th Cir. 2013).   Despite Plaintiff's reliance on several state court cases,

3   the Ninth Circuit establishes that "[f]ederal substantive law governs the question of

4   arbitrability." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).  Ganymede

5   argues that pursuant to the Intercreditor Agreement's arbitration provision, which

6   expressly incorporates the rules of the London Court of International Arbitration ("LCIA"),

7   all questions regarding arbitrability must be decided by the arbitrator, not the Court.

8   (Doc. 5 at 17).   While there is a presumption that courts will decide which issues are

9   arbitrable, "parties may delegate the adjudication of gateway issues to the arbitrator if they

10   'clearly and unmistakably' agree to do so."  *Portland Gen. Elec. Co. v. Liberty Mut. Ins.*

11   *Co.*, 862 F.3d 981, 985 (9th Cir. 2017) (quoting *Howsam v. Dean Witter Reynolds, Inc.*,

12   537 U.S. 79, 83-84 (2002)).

13       Here, the Intercreditor Agreement's arbitration provision provides:

14       Any dispute, controversy or claim arising out of or in connection with this
         Agreement shall (to the exclusion of any other forum) be referred to and
15       finally resolved by arbitration under the Arbitration Rules of The London
         Court of International Arbitration ("LCIA"). Subordinated Creditor and
16       Company each expressly agrees that its agreement to arbitrate, and any
         resulting award, falls under the United Nations Convention on the
17       Recognition and Enforcement of Foreign Arbitral Awards, and section 202,
         and Chapter 2, of the Federal Arbitration Act, and agrees that this Agreement
18       has a reasonable relation to a foreign state. . . . The seat, or legal place, of
         arbitration shall be London, England, and all proceedings shall occur there.[7]

19

20

21   [6] Defendants filed a Notice of Supplemental Authority to notify the Court of the United
     States Supreme Court's opinion in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No.
22   17-1272, 2019 WL 122164 (U.S. Jan. 8, 2019) (Doc. 46).  The Court in *Henry Schein* held
     that when the parties' contract delegates the question of the arbitrability of a particular
23   dispute to an arbitrator, a court may not override the contract, even if the court thinks that
     the argument that the arbitration agreement applies to a dispute is "wholly groundless."
24   2019 WL 122164, at *5 ("In sum, [the Court] reject[s] the "wholly groundless"
     exception.").  Thus, the Court's opinion in *Henry Schein* confirms that courts must respect
25   the parties' decision to delegate to the issue of arbitrability to the arbitrator, rather than a
     court.  *Id.* at *2.
26

27   [7] While neither party addresses the fact that the Intercreditor Agreement's arbitration
     provision requires that the arbitration be held in London, England, the Court nonetheless
28   addresses whether it has the power to enforce arbitration outside this district.   This
     arbitration provision provides that it "falls under the United Nations Convention on the
     Recognition and Enforcement of Foreign Arbitral Awards" (codified as 9 U.S.C. § 201 *et*

(Doc. 1-8 at 43).  Ganymede argues that the gateway issue of arbitrability must be left to the arbitrator because the Intercreditor Agreement's arbitration provision specifically provides that the LCIA rules govern arbitrations and the LCIA rules provide that the arbitrator decides the issues of arbitrability.  (Doc. 5 at 10-11).  The Court agrees.  *See Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.")[8]; *see also Portland Gen. Elec. Co.*, 862 F.3d at 985 (incorporation of ICC rules is clear and unmistakable evidence of intent to delegate gateway issues to arbitrator); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("under federal arbitrability law, the Delegation Provision 'clearly and unmistakably' delegated to an arbitrator the question whether the Arbitration Clause was enforceable by expressly incorporating the AAA arbitration rules, one of which provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the . . . validity of the arbitration agreement." *Khraibut v. Chahal*, 2016 WL 1070662, at *6 (N.D. Cal. Mar. 18, 2016) (collecting cases holding that incorporation of arbitrator rules manifests clear and unmistakable evidence of the parties' agreement to arbitrate arbitrability).  Thus, the incorporation of LCIA rules in

---

*seq.*), also known as the New York Arbitration Convention.  *Innospec Ltd. v. Ethyl Corp.*, 2014 WL 5460413, at *3 (E.D. Va. Oct. 27, 2014).  The New York Arbitration Convention applies to agreements that fall under § 2 of the FAA in which at least one party is foreign and grants jurisdiction to the district court for actions or proceedings involving such agreements.  *see* 9 U.S.C. §§ 202, 203.  A district court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." *Id.* § 206.  Over 150 nations have signed on to the Convention, including the United States and the United Kingdom.

[8] While many cases supporting this conclusion involve the incorporation of the AAA rules, the language of the LCIA Rules mirrors the language of rules, such as the AAA rules, that other courts have found meet the "clear and unmistakable" standard.  *Compare* LCIA Rule 23.1 ("The Arbitral Tribunal shall have the power to rule upon its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the Arbitration Agreement."), *with* AAA Commercial Rule 7 ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement or the arbitrability of any claim or counterclaim.").

the Intercreditor Agreement's arbitration provision is a clear and unmistakable agreement to delegate the adjudication of the gateway issue of arbitrability to the arbitrator.  *See Innospec Ltd. v. Ethyl Corp.*, 2014 WL 5460413, at *4 (E.D. Va. Oct. 27, 2014) ("Because the LCIA Rules clearly and unmistakably allow the arbitrator to determine his own jurisdiction, and the parties clearly and unmistakably agreed to arbitration under the LCIA Rules, the Court finds that the parties have clearly and unmistakably committed the first step of the arbitrability analysis to the arbitrator.").

Having found that the determination of arbitrability has been committed to the arbitrator, the Court need not decide whether Plaintiff's claims against Ganymede fall within the arbitration provision.  That is a matter for the arbitrator to decide, in accordance with the LCIA Rules.

### B.    Plaintiff's Claims Against Burford

The Court must first determine whether Burford, as a nonsignatory,[9] can in fact enforce the Intercreditor Agreement's arbitration provision.[10]  *See Smith v. Pinnamaneni*, 254 P.3d 409, 416 (Ariz. Ct. App. 2011) ("Nonsignatories . . . can be required to arbitrate under certain circumstances."); *see also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (holding nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles including "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel."); *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) (holding that

---

[9] Whether a nonsignatory is bound by an arbitration provision is a separate and distinct question from whether the claims are within the scope of the arbitration provision.  *Smith v. Pinnamaneni*, 254 P.3d 409, 416 (Ariz. Ct. App. 2011) (holding that the court must decide whether a nonsignatory is bound by the arbitration provision and "cannot simply defer to the finding of the arbitrator."); *see also Kramer*, 705 F.3d at 1126 (holding that even if the parties delegated the issue of arbitrability to the arbitrator, the court must address whether a nonsignatory can enforce the arbitration provision).

[10] Plaintiff does not seem to dispute the issue of whether Buford, as a nonsignatory, can enforce the Intercreditor Agreement's arbitration provision, but does dispute whether Plaintiff's claims against Burford are within the scope of the applicable arbitration provision.  However, the Court has already determined that the Note is subject to the Intercreditor Agreement's arbitration provision, and that provision allows the arbitrator to determine whether the claims are subject to arbitration; therefore, if Buford can enforce the arbitration provision, then the Court will defer the question of arbitrability of Plaintiff's claims against Burford to the arbitrator.

"nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."). Enforcement of an arbitration agreement by a nonsignatory under the FAA is governed by the law of the forum state. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *In re Henson*, 869 F.3d 1052, 1059-60 (9th Cir. 2017). Arizona law allows a nonsignatory to enforce an arbitration provision against a signatory under principles of "alternative estoppel" either (1) "when the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided" or (2) "[w]hen each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement [and] the signatory's claims arise out of and relate directly to the written agreement." *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 294 P.3d 125, 134-35 (Ariz. Ct. App. 2012) (quoting *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005)); *see also Mundi*, 555 F.3d at 1046 (recognizing same two-part test).

Here, the Court finds that not only is the relationship between Burford and Ganymede sufficiently close—in fact, Plaintiff claims that Ganymede is simply a "mere alter ego of Burford"—but Plaintiff's claims against Burford are also founded in and intertwined with Ganymede's obligations and rights under the Note. *Sun Valley Ranch,* 294 P.3d at 134-35; *see also Kramer,* 705 F.3d at 1132 ("Plaintiffs' claims themselves must intimately rely on the existence of the Purchase Agreements, not merely reference them."); *Am. Bankers Ins. Group, Inc. v. Long,* 453 F.3d 623, 630 (4th Cir. 2006) (holding all of Plaintiff's claims depended on the terms of the note and because the note incorporated by reference the contract that contained the arbitration agreement, "it would be inequitable to allow [Plaintiffs] to seek recovery on their individual claims and at the same time deny that ABIG was a party to the [contract]'s arbitration clause.")

For example, in the Second Amended Complaint,[11] Plaintiff's first cause of action

---

[11] Unlike in *Kramer*, where the Plaintiffs' "complaints did not rely on or use any terms or obligations of the operating agreements as a foundation for their claims and did not even

requests a declaration that Burford and Ganymede failed to observe corporate formalities and therefore, "Ganymede's corporate veil may be disregarded as a mere alter ego of Burford." (Doc. 1-3 at 82). Additionally, Plaintiff's second cause of action for breach of the covenant of fair dealing implied into the Note is alleged against both Ganymede and Burford, and entirely depends on Burford being found to be a party to the Note. (*Id.* at 83-84). Similarly, under Plaintiff's third cause of action for tortious interference with prospective business expectancy alleged against only Burford, Plaintiff's claims stem from how Ganymede, not Burford, marketed and then sold the Note. (*Id.* at 84-54). Thus, Plaintiff's claims necessarily rely on the existence of the Note and require an examination of Ganymede's rights and obligations under the Note. *See Sun Valley Ranch,* 294 P.3d at 135 (finding the nonsignatory "may nevertheless compel plaintiffs to arbitrate their claims against him" because "the trier of fact will be required to consider the [underlying agreements] in resolving plaintiffs' claims, and [the nonsignatory's] conduct is intertwined with that of other defendants who signed the [underlying agreement]."); *see also Am. Bankers Ins. Group, Inc.,* 453 F.3d at 630 (reasoning that all of the Plaintiffs' claims depended on the terms of the note and without the note the Plaintiffs would have no cause to complain). Therefore, Burford is entitled to enforce the Intercreditor Agreement's arbitration provision, which commits the first step of the arbitrability analysis to the arbitrator.

## IV.    CONCLUSION

The FAA provides that, upon determining that an issue in a pending action is subject to a mandatory arbitration provision, a federal court "shall . . . stay the action until such arbitration has been had." 9 U.S.C. § 3. "Notwithstanding this statutory language . . . the majority of courts . . . have held that a stay serves no obvious purpose and dismissal is appropriate where the entire controversy between the parties is subject to and will be resolved by arbitration." *Altela Inc. v. Arizona Sci. & Tech. Enterprises LLC*, 2016 WL

---

mention the agreements"; here, Plaintiff's Seconded Amended Complaint specifically references the Note and the FPAs multiple times and all of the causes of action reference the Note. *Kramer*, 705 F.3d at 1129.

4539949, at *8 (D. Ariz. Aug. 31, 2016); *see also Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) (affirming dismissal of case where all claims were subject to arbitration).  Having concluded that arbitration should be compelled, the Court must now consider whether to stay or dismiss this action.  *Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014) (holding that when a court "determines that all of the claims raised in the action are subject to arbitration," the court "may either stay the action or dismiss it outright.").

The Court, in its discretion, finds that a stay of this action is appropriate because the arbitration provision delegates the gateway question of arbitrability to the arbitrator.  Thus, the arbitrator will decide which of Plaintiff's claims are subject to arbitration and, if the arbitrator decides that not all of Plaintiff's claims are subject to arbitration, then this litigation can proceed in this Court on those non-arbitrable claims.  Therefore, a stay will help advance judicial economy.  *Wilcox v. Ho-Wing Sit*, 586 F. Supp. 561, 567 (N.D. Cal. 1984) (granting stay where arbitrator's decision was likely "to decide issues that will, at least, streamline subsequent proceedings" before the court); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (affirming district court's decision to stay lawsuit pending an arbitration that "might well decide issues which bear in some way on the court's ultimate disposition" of nonarbitrable claims).  Accordingly,

**IT IS ORDERED** that Defendants' Rule 12(b)(1) Motion to Compel Arbitration Pursuant to the Federal Arbitration Act, and to Dismiss or Stay this Litigation (Doc. 5) is **GRANTED**.  This action is **STAYED** pending arbitration;

**IT IS FURTHER ORDERED** the parties shall file a Joint Status Report as to the arbitrability of Plaintiff's claims within five (5) days of the arbitrator rendering a decision on its jurisdiction over Plaintiff's claims;

**IT IS FURTHER ORDERED** the parties shall file a Joint Status Report as to the status of arbitration on or before **April 14, 2019**, and thereafter every three (3) months; and

…

…

- 12 -

1    **IT IS FINALLY ORDERED** that Defendants' Motion for Reconsideration of

2  Order Regarding the Parties' MIDP Obligations (Doc. 24) is **DENIED AS MOOT**.

3    Dated this 14th day of January, 2019.

4

5

6    _____
     Honorable Diane J. Humetewa

7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28